UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

DANIEL PEREZ,

          Plaintiff,

v.

KATHRYN GREY, et al.,

          Defendant.

CASE NO. 2:21-cv-00095-LK-DWC

REPORT AND RECOMMENDATION

Noting Date: April 19, 2022

The District Court has referred this action filed under 42 U.S.C. § 1983 to United States Magistrate Judge David W. Christel. Plaintiff, proceeding *pro se* and *in forma pauperis*, filed this civil rights complaint under 42 U.S.C. § 1983. Dkt. 1, 12, 42. Currently pending before the Court is Defendant's Motion for Summary Judgment (Dkt. 76).

## BACKGROUND

Plaintiff is an inmate at the Monroe Corrections Center (MCC), and until recently he was housed in the E-Unit, which is a mental health residential treatment unit designed for individuals with significant mental health disorders. Dkt. 27, 28. However, on August 12, 2021 Plaintiff was

REPORT AND RECOMMENDATION - 1

moved from the E-Unit to the F-Unit, after this Court denied Plaintiff's successive motions for a Temporary Restraining Order that sought to prevent the move. Dkt. 35, 37, 52, 64, 77 at 1.

On July 20, 2021 Plaintiff filed a Second Amended Complaint—the operative complaint—in which he alleges sixteen Department of Corrections (DOC) employees retaliated against him. Generally, Plaintiff alleges:

> [Beginning in approximately] January 2019 [DOC] staff launched into a campaign of harassment against Plaintiff Daniel Jay Perez to include acts such as tampering with incoming and outgoing correspondence (including legal mail), harassing cell searches, damaging Plaintiff's property, filing and sanctioning Plaintiff based on a falsified serious infraction, threatening Plaintiff with potential transfers and taking actions to carry out the threatened transfer as well as allowing other incarcerated individuals free reign to threaten and sexually harass Plaintiff because he exercises his First Amendment rights to file institutional grievances/resolution requests, initiating litigation against Department staff, and making complaints to other government officials who have oversight of Defendants acts of abusing their police powers in an attempt to retaliate against Plaintiff and silence his Free Speech.

Dkt. 42 at 7-8.

On December 23, 2021 Defendants filed a motion for summary judgment. Dkt. 76. After the Court granted Plaintiff's motions for extension of time and to file an over-length response, on January 27, 2022 Plaintiff filed a response. Dkt. 93. On February 17, 2022, Defendants filed a reply, which, as discussed herein, contains a motion to strike certain documents submitted by Plaintiff. Dkt. 98. Then, on February 28, 2022, Plaintiff submitted a document entitled "Plaintiff's Motion to Strike Defendant's Motion to Strike Plaintiff's Evidence Attached to Plaintiff's Motion in Opposition." Dkt. 100.

## MOTIONS TO STRIKE

Before turning to the motion for summary judgment the Court addresses the parties' cross motions to strike. In their reply, Defendants move to strike several documents submitted by Plaintiff, arguing they lack foundation, are irrelevant, and/or constitute inadmissible hearsay.

Dkt. 98 at 2. In response, Plaintiff filed a stand-alone "Motion to Strike Defendant's Motion to Strike Plaintiff's Evidence Attached to Plaintiff's Motion in Opposition." Dkt. 100.

Local Civil Rule (LCR) 7(g)(1) requires a party to file a "notice of intent to file a sur-reply as soon after receiving the reply brief as practicable, and pursuant to LCR 7(g)(2) sur-replies are limited to requests to strike material contained in or attached to a reply brief. Plaintiff did not file a notice of intent to file a sur-reply prior to filing his stand-alone motion at docket 100. Accordingly, this motion is denied and stricken from the record.

As for Defendants' motion to strike, only admissible evidence may be considered in ruling on a motion for summary judgment. *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002); *see also* Fed. R. Civ. P. 56(e). A party may object to cited documentation asserting the material would not be admissible in evidence. Fed. R. Civ. P. 56(c)(2). Admissible declarations or affidavits must be based on personal knowledge, must set forth facts that would be admissible in evidence, and must show the declarant or affiant is competent to testify on the matters stated. Fed. R. Civ. P. 56(c)(4). Objections to evidence because the evidence is irrelevant, speculative, argumentative, vague and ambiguous, or constitutes an improper legal conclusion, is duplicative of the summary judgment standard itself. *See Burch v. Regents of University of California*, 433 F.Supp.2d 1110, 1119–20 (E.D. Cal. 2006). Thus, to the extent any declaration or exhibit submitted by either party does not meet these requirements it will not be considered by the Court in ruling on Defendants' Motion for Summary Judgment. Therefore, the Court denies Defendants' motion to strike as moot.

## STANDARD

Summary judgment is proper only if the pleadings, discovery, and disclosure materials on file, and any affidavits, show that there is no genuine dispute as to any material fact and that the

movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586(1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt"); *see also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

## DISCUSSION

To state a claim under 42 U.S.C. §1983 at least two elements must be met: (1) the defendant must be a person acting under color of state law, (2) and his conduct must have deprived the plaintiff of rights, privileges or immunities secured by the Constitution or laws of the United States. *Parratt v. Taylor*, 451 U.S. 527, 535 (1981). Implicit in the second element is a third element of causation. *See Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 286-87 (1977); *Flores v. Pierce*, 617 F.2d 1386, 1390-91 (9th Cir. 1980), *cert. denied*, 449 U.S. 875 (1980). When a plaintiff fails to allege or establish any of these three elements his complaint must be dismissed.

To prevail on a retaliation claim, in particular, a plaintiff must allege and prove defendants retaliated against him for exercising a constitutional right and the retaliatory action

REPORT AND RECOMMENDATION - 4

did not advance legitimate penological goals or was not narrowly tailored to achieve such goals. *Hines v. Gomez,* 108 F.3d 265, 267 (9th Cir. 1997).

A prisoner suing a prison official under 42 U.S.C. § 1983 for retaliation for engaging in protected speech must allege "the type of activity he engaged in was protected under the first amendment and that the state impermissibly infringed on his right to engage in the protected activity." *Rizzo v. Dawson*, 778 F.2d 527, 531 (9th Cir. 1983). Courts examine such claims with skepticism to avoid interfering too much with prison operations. *See Pratt v. Rowland*, 65 F.3d 802, 807 (9th Cir. 1995) (noting that retaliation claims should be evaluated in light of the Supreme Court's desire to avoid excessive judicial involvement in prison administration).

Thus, a viable claim of First Amendment retaliation entails five basic elements: (1) an assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal. *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005) (citations omitted). "[M]ere speculation that defendants acted out of retaliation is not sufficient." *Wood v. Yordy,* 753 F.3d 899, 905 (9th Cir. 2014) (citations omitted).

Plaintiff asserts several state actors took adverse action against him. The Court will begin with Plaintiff's allegations of adverse action by Defendant Grey acting alone, proceed to the allegations involving Defendant Grey acting in conjunction with other Defendants, and then address Plaintiff's allegations of other Defendants acting in conjunction with each other.

I.     Defendant Grey

First, Plaintiff alleges Defendant Grey was one of several MCC employees who forced Plaintiff to take anti-psychotic medication. Dkt. 42 at 10-11. In his declaration in support of his

response in opposition to summary judgment Plaintiff asserts, without supporting evidence, that Defendant Grey told him his "housing assignment was contingent upon [his] medication compliance" and that if he refused anti-psychotic medication he "would be placed in the Close [sic] Observation Area or segregation." Dkt. 94 at 2. According to Plaintiff, he then filed a lawsuit[1] against Defendant Grey and other DOC staff, and in retaliation, "on January 25, 2019, staff filed paperwork to officially start the process to involuntarily medicate [Plaintiff]," and he was forced to take medication between February 7, 2019 and March 5, 2019. Dkt. 94 at 3.

Defendants dispute that Defendant Grey had the power to place any inmate on medication because she was not a healthcare provider, and therefore Plaintiff fails to allege Defendant Grey acted adversely to Plaintiff on this claim. Dkt. 76 at 6.

Plaintiff argues a jury must decide whether Defendant Grey was attempting to "chemically silence" him because the involuntary medication began immediately after he filed the above referenced lawsuit. Dkt. 96 at 26. According to Plaintiff, this un-coincidental timing, together with an email exchange between Defendant Grey and a nurse practitioner named Lamin Sanneh could lead a reasonable juror to "conclude that Defendant Grey set in motion the unconstitutional deprivation" to retaliate against Plaintiff naming her in a lawsuit. Dkt. 96 at 26. While Plaintiff is correct that timing can properly be considered as circumstantial evidence of retaliatory intent, it is clear from other evidence in the record that retaliation for filing a lawsuit against Defendant Grey was not the cause for Plaintiff being involuntarily medicated. *See e.g.*, *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1316 (9th Cir. 1989). Defendant Grey did not have the power to unilaterally place Plaintiff on medication. Instead, an "Involuntary

---

[1] *Perez v. Cogburn, et al.*, Case No.18-CV-1800 JLR-BAT was filed on 12/12/2018 in the United States District Court for the Western District of Washington (Seattle), and remains an open case.

REPORT AND RECOMMENDATION - 6

Antipsychotic Mediation Treatment Hearing" was held on February 7, 2019, and "after due deliberation and consideration of all the evidence presented, the Involuntary Antipsychotic Medication Treatment Hearing Committee determined that 14-Day Involuntary Antipsychotic Medication Treatment [was] appropriate." Dkt. 94 at 41.

Notably, the email from Nurse Practitioner Lamin Sanneh (Mr. Sanneh) was sent to many DOC employees, including Defendant Grey, indicating that Plaintiff told Mr. Sanneh he was choosing to discontinue his mediation because it was causing him to gain weight. Dkt. 94 at 43. Mr. Sanneh expressed concern about what would follow, stating:

> At this point I don't think we have grounds for involuntary psych meds. If he continue[s] to refuse, I will discontinue them and if he messe[s] up, then we could put him in the COA and put him on invol[untary] psych meds. Keep [a] close eye on him and I will also let officers know to watch out for inappropriate behaviors.

*Id*. The Court finds this email bolters the conclusion that as a result of Plaintiff's choice to discontinue his anti-psychotic medication he began demonstrating "inappropriate behaviors" as Mr. Sanneh feared, leading to the Involuntary Antipsychotic Medication Treatment Hearing Committee's decision to involuntary medicate Plaintiff to reasonably advance the legitimate correctional goal of keeping Plaintiff and others safe, given Plaintiff's history of suicidal ideation and suicide attempts. Dkt. 94-1 at 278-279, 281. Therefore, the Court finds Plaintiff has failed to meet his burden of proving Defendant Grey violated his constitutional rights by forcing him to take medication.

Next, according to Plaintiff, Defendant Grey initiated a Prison Rape Elimination Act (PREA) investigation against his wishes for the purpose of harassing him. Dkt. 42 at 13. Plaintiff alleges that he "reported to Defendant Camden Crouse that [an inmate] had been making sexual comments about Plaintiff's butt and that Plaintiff feels these comments are inappropriate." Dkt. 42 at 13. According to Plaintiff, he simply wanted Defendant Crouse "to have a talk with this individual so

that the comments would cease," but Defendant Grey decided to initiate a PREA investigation instead to retaliate against him for his First Amendment activities. Dkt. 42 at 14-15. Plaintiff also inconsistently argues that when Defendant Grey did not immediately infract the offending inmate for a PREA violation this, too, was intended to harass and retaliate against Plaintiff. *Id*.

Defendants argue that Plaintiff fails to identify anything adverse to him related to the initiation of a PREA investigation, and offers evidence indicating the incident was ultimately found to *not* be a PREA violation. Dkt. 76 at 8; Dkt. 98 at 6; Dkt. 99-1 at 2-4.

To determine whether a defendant's actions were "because of" a prisoner's protected conduct, the Court may examine either direct or circumstantial evidence, including the timing of the alleged adverse action, a defendant's expressed opposition to Plaintiff's speech, or "other evidence that the reasons proffered by the [defendant] for the adverse … action were false and pretextual." *McCollum v. California Dep't of Corr. and Rehab.*, 647 F.3d 870, 882 (9th Cir. 2011) (quoting *Allen v. Iranon*, 283 F.3d 1070, 1077 (9th Cir. 2002)). However, under *Wood v. Yordy*, "[m]ere speculation that defendants acted out of retaliation is not sufficient." 753 F.3d 899, 905 (9th Cir. 2014). In *Wood*, a prisoner alleged prison officials were retaliating against him for winning an appeal, and produced evidence of isolated statements of dislike from prison staff and a memo stating "we cannot make it appear that an inmate can win." *Id*. at 901, 904. The Ninth Circuit held even that statement did not raise the prisoner's claims above the speculative level. *Id*. at 905.

Here, Plaintiff does not offer direct or circumstantial evidence that Defendant Grey initiated a PREA investigation because of Plaintiff's First Amendment activities. Instead, Plaintiff merely speculates that Defendant Grey had a retaliatory motive. Therefore, the Court concurs with Defendants that Plaintiff has failed to meet his burden of proving Defendant Grey violated his constitutional rights by initiating such an investigation after being informed of Plaintiff's allegation of harassment.

1     Plaintiff's final claim against Defendant Grey, individually, alleges Defendant Grey is
2  ultimately responsible for forcing his move to the F-Unit. Dkt. 42 at 41. Plaintiff alleges that
3  Defendant Grey repeatedly threatened to do so, and deliberately sought to create a hostile living
4  environment for Plaintiff so that moving him away from the E-Unit would become necessary.
5  *See e.g.*, Dkt. 42 at 25, 29, 32, 33, 35, 44, 45. Plaintiff further argues that when Defendant Grey
6  was served in late February 2021 with the instant lawsuit she redoubled her efforts to force a
7  transfer. Dkt. 93 at 19.
8      There is no dispute that Defendant Grey supported Plaintiff's transfer away from the E-
9  Unit, however Defendants aver that Defendant Grey was not unilaterally responsible for
10 Plaintiff's move—it was a team decision, as discussed in more detail below. Dkt. 76 at 6-7. In
11 fact, as Defendants indicate, the move was initiated by Plaintiff's primary treating provider, Dr.
12 Pruden, contrary to Plaintiff's contention that Dr. Pruden did not support the move. *See e.g.*, Dkt.
13 93 at 11; Dkt. 27 at 3. The Mental Health Transfer Procedure and Mental Health Transfer Care
14 Review Committee then voted to transfer Plaintiff to the F-Unit and the Chief of Psychology for
15 MCC, Dr. Traci Drake, approved it because she believed "Perez's transfer to F Unit [was] a
16 clinically important step for Mr. Perez as he has completed his therapeutic treatment work with
17 Dr. Pruden." Dkt. 51 at 3.
18     The Court finds Plaintiff has not presented any evidence to support the conclusion that
19 his transfer to the F-Unit deprived him of his rights, privileges or immunities secured by the
20 constitution or laws of the United States, particularly where he was transferred to a less
21 restrictive unit that offered more privileges than the E-Unit. Afterall, an inmate does not have a
22 right to any particular classification. *Meachum v. Fano*, 427 U.S. 215, 223–27 (1976).
23     Moreover, Plaintiff has not shown his transfer was "because of" his protected conduct or
24 for any purpose other than to reasonably advance a legitimate correctional goal. *Pratt*, 65 F.3d at

806 (prisoner bears the burden of pleading and proving absence of legitimate correctional goals for the conduct of which he complains). To the contrary, Defendant Grey submitted a sworn declaration describing how Plaintiff relentlessly disrupted daily activities on the E-unit and sabotaged his opportunity to benefit from the special programming the E-Unit offers. Defendant Grey wrote:

> During his time on E Unit, the other staff and myself have made every effort to engage Perez in the programming that was available and interesting to him. At his request, Perez was given the opportunity to be the unit clerk, participate in the horticulture program, and the animal program. Each time Perez has been given an opportunity to participate in programming, he has dropped out of the program. Perez was also given the opportunity, at his request, to be the representative for his pod, he also quit this position after a short term. Despite extensive efforts by staff and myself, Perez does not engage in the programming available to him on the unit.
>
> Staff and myself have observed Perez spending much of his time monitoring staff actions. When Perez observes even the most minor procedural violation by a staff member he treats it like a major issue and will confront the staff member or complain about the issue excessively.
>
> Inmates are encouraged to resolve any issues on an informal level before filing grievances. When Perez has an issue, he confronts individuals in an argumentative manner under the guise of attempting to resolve the issue informally. During these attempts to resolve issues informally, Perez will routinely threaten to file a grievance if the other party does not agree to his resolution of the issue. For example, one of the issues that was pursued by Perez in the manner described, was a complaint over a television being turned off approximately ten minutes later than the procedure indicated.
>
> I have also become aware that Perez coaches other inmates to complain about staff over minor issues. Perez has studied the regulations and policies meticulously and will frequently pressure and coach other inmates to lodge complaints over minor procedural errors that he notices.
>
> Perez's near constant argumentative confrontations and procedural complaints, take up an inordinate amount of staff time and resources to deal with. The result of which is that staff time is taken away from assisting Perez and other inmates with achieving their programming and treatment goals.
>
> It is apparent, based upon Perez's long running systematic practice of aggressively challenging staff and complaining, that his objective is to disrupt the day-to-day operations of the unit. To this end, Perez's tactics have been successful. Staff on E

REPORT AND RECOMMENDATION - 10

> Unit is reluctant to interact with Perez out of a desire to avoid an argumentative confrontation or having to endure another complaint against themselves over a procedural irregularity. Perez's actions have caused significant difficulties for staff managing E Unit.
>
> Due to Perez's behavior, it is nearly impossible for him to participate in any of the programming in a meaningful or productive way. Perez has been counseled numerous times by myself and other staff about the effects his behaviors and actions are having on the unit. As well as the negative effect his behavior is having on his own potential for success on E Unit. So far, nothing has dissuaded Perez from this disruptive behavior.

Dkt. 28 at 2-3. In conclusion, the Court finds Plaintiff has failed to meet his burden of proving Defendant Grey violated his constitutional rights by supporting his transfer.

II.     <u>Defendant Grey and Ewing</u>

Next, Plaintiff contends Defendant Grey filed an infraction against him alleging he "provided false information to an ombuds leading to an innocent person being proceeded against or penalized." Dkt. 42 at 35. Then, according to Plaintiff, Defendant Ewing adversely acted by finding Plaintiff guilty of that infraction. Dkt. 42 at 35-36. As a result, Plaintiff served 10 days of cell confinement, 15 days of no dayroom access, and 15 days of no store or commissary privileges. Dkt. 42 at 37.

Defendants argue that Plaintiff merely speculates that Defendant Grey acted with a retaliatory motive when filing the infraction report, but even assuming she did, there is no evidence that Defendant Ewing had a retaliatory motive or failed to follow DOC regulations covering the conduct and procedure of infraction hearings, including WAC 137-28-310(1), which provides that: "[i]n reaching a decision, the hearing officer will consider only the evidence presented at the hearing." Dkt. 76 at 9. Defendants further note that, generally speaking, infracting inmates for suspected false reporting about other inmates reasonably advances a legitimate correctional goal. Dkt. 76 at 7. Finally, Defendants point to Plaintiff's infraction record, which shows that on appeal the superintendent found Plaintiff not guilty. *See* Dkt. 12 at 32-33; Dkt. 77-1 at 2-3.

REPORT AND RECOMMENDATION - 11

Here again, the Court finds Plaintiff does not offer direct or circumstantial evidence that either Defendant Grey or Defendant Ewing proceeded as they did because of Plaintiff's First Amendment activities. Instead, Plaintiff merely speculates that Defendant Ewing, whose guilty finding resulted in Plaintiff's loss of privileges, failed to follow policy. As previously stated, "mere speculation" will not suffice to establish a constitutional violation. *Wood*, 753 F.3d at 905. Accordingly, the Court finds Plaintiff has failed to meet his burden of proving Defendants Grey and Ewing violated his constitutional rights by infracting him for false reporting.

III.    Defendants Grey and Crouse

Plaintiff alleges Defendants Grey and Crouse adversely acted by confiscating a Covid mask on which Plaintiff had written "BLM" to show his support for the Black Lives Matter movement, and then gave him a negative Behavior Observation Entry (BOE). Dkt. 42 at 37-38; Dkt. 76 at 10. In his response in opposition to the motion for summary judgment Plaintiff argues that the fact Defendants tried, again, to stop him from wearing a BLM mask after the negative BOE was reversed proves Defendants confiscated the BLM mask in the first place in retaliation for Plaintiff exercising his First Amendment rights. Dkt. 93 at 25.

Defendants contend that since Plaintiff prevailed on his grievance regarding the BOE he cannot prove adverse action "of a negative BOE regarding the mask." Dkt. 76 at 10.

The Court finds Plaintiff's argument that Defendants Grey and Crouse acted with a retaliatory motive to be speculative, at best. Plaintiff's own evidence indicates staff were confused at the beginning of the Black Lives Matter movement regarding DOC guidance about COVID-19 masks that might be construed as derogatory, offensive, or a security threat. Dkt. 77-1 at 5. The grievance investigation concluded that "the confiscation of the mask and subsequent BOE [was a] misinterpretation of the July 10, 2020 directive and not an intentional attack on [Plaintiff's] 1st Amendment protections." *Id*. at 6. Plaintiff has not presented any evidence to the

1  contradict this determination. Thus, the Court does not find any material question of fact remains
2  unanswered regarding Defendants Grey and Crouse's intent—they did not remove Plaintiff's
3  mask "because of" his protected conduct.
4        Accordingly, the Court finds Plaintiff has failed to meet his burden of proving
5  Defendants Grey and Crouse violated his constitutional rights by confiscating his BLM mask and
6  issuing a BOE.
7      IV.    <u>Defendants Harrod and Wright</u>
8        Plaintiff alleges Defendant Harrod and Wright took adverse action against him by spilling
9  liquid on some of his property during a search of his cell for "pruno"—a type of alcoholic
10 beverage sometimes made by prisoners. Dkt. 42 at 17-19. Although Plaintiff acknowledges that
11 Defendant Harrod admitted the spill was accidental, in his response in opposition to the motion
12 for summary judgment Plaintiff argues that if it really was accidental Defendant Harrod would
13 have told Plaintiff about it immediately upon leaving his cell instead of carrying on checking
14 other cells. Dkt. 42 at 19; Dkt. 93 at 23.
15       Defendants counter that Plaintiff acknowledges "pruno" searches are commonplace, and
16 he does not provide any evidence that Defendant Harrod spilled the bleach water because he was
17 upset about Plaintiffs exercise of his First Amendment rights. Dkt. 76 at 8; Dkt. 98 at 6-7.
18 Defendant states that Plaintiff's recourse for any damaged property caused by the spill is to
19 pursue a post-deprivation remedy. Dkt. 76 at 8.
20       To be sure, the Court finds such evidence lacking, and notes Plaintiff's own evidence
21 indicates Defendant Harrod took responsibility for accidentally spilling liquid when he lifted a
22 bowl that he did not know contained bleach water, that Plaintiff was not permitted to have bleach
23 water in his cell, and that DOC policy does not require officers to leave forms indicating they
24

REPORT AND RECOMMENDATION - 13

1  performed a pruno check unless they confiscate something. Dkt. 94-1 at 13. Accordingly, the

2  Court finds Plaintiff has failed to meet his burden of proving Defendants Harrod and Wright

3  violated his constitutional rights by accidentally spilling liquid during a pruno check of his cell.

4      V.    <u>Defendants Johnson, Dire and Mclean</u>

5  Next, Plaintiff maintains that Defendants Johnson, Dire, and Mclean took adverse action

6  against him by taking photographs of a mirror in his cell, which they claimed presented a safety

7  and security concern but was in fact used as a pretext to harass Plaintiff. Dkt. 42 at 19-20. In his

8  response in opposition to the motion for summary judgment Plaintiff argues that this event,

9  coupled with several others, were designed to cause him "mental distress" in retaliation for his

10 advocacy of "both his peers and himself" and ultimately lead to his choice to resign as the "Tier

11 Rep" because he could not handle Defendants' "relentless harassment." Dkt. 93 at 24.

12 Defendants insist that photographing a mirror in Plaintiff's cell does not constitute an

13 adverse action. Dkt. 76 at 8-9; Dkt. 98 at 7.

14 "[A]lthough cell searches are a routine part of prison life, a cell search may nonetheless

15 constitute an adverse action … if performed with a retaliatory motive and lacking a legitimate

16 correctional goal." *Cejas v. Paramo*, Case No.: 14-CV-1923-WQH(WVG), 2017 WL 1166288,

17 *6 (S.D. Cal. 2017) (internal citations omitted). While Plaintiff alleges the mirror "search" was

18 pretextual, his evidence, once again, contradicts his argument. It indicates that Defendant Warner

19 determined upon a "Level II Appeal" that the "mirror in question was discovered by staff on

20 swing shift during a routine tier check, which was separate from cell inspections. Tier checks are

21 done hourly and are independent from the daily sanitation inspections; tier checks do not require

22 a [search report] be completed." Dkt. 94-1 at 64. Defendant Warner closed the complaint,

23 indicating there was no evidence of "staff retaliation." *Id*.

24

1   Thus, the record evidence supports the conclusion that Defendants photographed

2   Plaintiff's mirror for a legitimate penological reason. *See Pratt*, 65 F.3d at 806 (prisoner bears

3   the burden of pleading and proving absence of legitimate correctional goals for the conduct of

4   which he complains). Accordingly, the Court finds Plaintiff has failed to meet his burden of

5   proving Defendants Johnson, Dire, and Mclean violated his constitutional rights by

6   photographing a mirror in his cell.

7   VI.     Defendant Seeley

8   Plaintiff claims Defendant Seeley took adverse action against him by swearing at him

9   during mail call, and later delaying Plaintiff's attendance at mainline dinner by fifteen minutes.

10  Dkt. 42 at 38-39.

11  Defendants argue that being sworn at and made late for dinner do not constitute adverse

12  actions. Dkt. 76 at 9-10; Dkt. 98 at 7-8.

13  While the record is wholly lacking evidence on this claim, it bears noting that verbal

14  harassment cannot form the basis of a section 1983 claim. *See Oltarzewski v. Ruggiero*, 830 F.2d

15  136, 139 (9th Cir. 1987) (using vulgar language when speaking to an inmate does not constitute a

16  constitutional deprivation) overruled in part on other grounds by *Shakur v. Schriro,* 514 F.3d

17  878, 884-85 (9th Cir. 2008). Accordingly, the Court finds Plaintiff has failed to meet his burden

18  of proving Defendant Seeley violated his constitutional rights by swearing at him and making

19  him late for dinner.

20  VII.    Defendants Seeley, Johnson and Mclean

21  Plaintiff makes two different allegations against Defendants Seeley, Johnson and Mclean

22  regarding his mail. First, Plaintiff claims that on October 6, 2020, Defendants Seeley and

23  Johnson "did not attempt to process Plaintiff's outgoing legal mail in accordance with DOC

24

1  POLICY 450.100 … [which] requires DOC staff to fill out the outgoing legal mail log form
2  DOC 21-286." Dkt. 42 at 40. Second, according to Plaintiff, Defendants Seeley, Johnson, and
3  Mclean "have tampered with or deliberately delayed processing or providing Plaintiff his
4  incoming and outgoing mail, including legal mail." *Id*.
5       Defendants argue that these allegations are conclusory and provide no detail as to what
6  action each individual took. Dkt. 76 at 10-11. The Court concurs that Plaintiff has failed to make
7  an individualized showing as to each individual Defendant whose acts or omissions are alleged
8  to have caused a constitutional deprivation. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).
9  Accordingly, the Court finds Plaintiff has failed to meet his burden of proving Defendants
10 Seeley, Johnson and Mclean violated his constitutional rights in their processing of Plaintiff's
11 mail.
12     VIII.   <u>Defendants Warner, Anderson, Styles, Drake and MacLeod</u>
13      Plaintiff alleges Defendants Warner, Anderson, Styles, Drake, and MacLeod acted
14 adversely against him by sitting on the Mental Health Transfer Procedure and Mental Health
15 Transfer Care Review Committee. Dkt. 42 at 44.
16      Defendants correctly assert that serving as a member of a team cannot be a basis for
17 section 1983 liability. Dkt. 76 at 11; Dkt. 98 at 8-9. The Ninth Circuit has rejected the "team
18 effort" theory of liability because it "allows the jury to lump all the defendants together, rather
19 than require it to base each individual's liability on his own conduct." *Chuman v. Wright*, 76 F.3d
20 292, 295 (9th Cir.1996). Instead, Plaintiff must prove that each individual defendant acted (or
21 failed to act) in a way that caused the alleged constitutional deprivation, and since he has failed
22 to do so the Court rejects Plaintiff's claim that Defendants Warner, Anderson, Styles, Drake, and
23
24

MacLeod adversely acted against him by serving on the Mental Health Transfer Procedure and Mental Health Transfer Care Review Committee. *Aldabe*, 616 F.2d at 1092.

Accordingly, the Court finds Plaintiff has failed to meet his burden of proving Defendants Warner, Anderson, Styles, Drake, and MacLeod violated his constitutional rights by serving on the Mental Health Transfer Procedure and Mental Health Transfer Care Review Committee.

IX.     Defendant Johnson, Mclean, Dire, Wright, Harrod, and Seeley

Plaintiff alleges Defendants Johnson, Mclean, Dire, Wright, Harrod, and Seeley harassed him vis-à-vis such adverse actions as leaving the dayroom television on during recall times, leaving the television on during the entire graveyard shift, refusing to log Plaintiff's work hours, failing to leave DOC Form 05-384 as required after entering an inmate's cell, and tampering with his incoming and outgoing mail. Dkt. 42 at 24.

Plaintiff has not presented any evidence to support a finding of deprivation of his rights, privileges or immunities secured by the constitution or laws of the United States relative to any of these allegations. *See Parratt*, 451 U.S. at 535 (1981). Plaintiff also fails to make any individualized showing as to each individual Defendant whose acts or omissions are alleged to have caused a constitutional deprivation. *Iqbal*, 556 U.S. at 676. Thus, this claim fails to sufficiently allege, much less prove, that Defendants Johnson, Mclean, Dire, Wright, Harrod, and Seeley retaliated against Plaintiff for exercising a constitutional right or that the retaliatory action did not advance legitimate penological goals or was not narrowly tailored to achieve such goals. *Hines*, 108 F.3d at 267. Accordingly, the Court finds Plaintiff has failed to meet his burden of proving Defendants Johnson, Mclean, Dire, Wright, Harrod, and Seeley violated his constitutional rights by harassing him.

CONCLUSION

Based on the foregoing, the Court recommends GRANTING Defendants' Motion for Summary Judgment (Dkt. 76) and DISMISSING this case with prejudice.

Separately, Defendant's Motion to Strike, contained in Dkt. 98, is denied as moot, and Plaintiff's Motion to Strike Defendants' Motion to Strike (Dkt. 100) is denied for the reasons set forth, *supra*. The clerk is directed to strike docket 100 from the record.

Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of *de novo* review by the district judge. *See* 28 U.S.C. § 636(b)(1)(C). Accommodating the time limit imposed by Fed. R. Civ. P. 72(b), the clerk is directed to set the matter for consideration on April 19, 2022, as noted in the caption.

Dated this 5th day of April, 2022.

David W. Christel
United States Magistrate Judge