UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

DANIEL JAY PEREZ,

              Plaintiff,

     v.

KATHRYN GREY et al.,

              Defendants.

CASE NO. 2:21-cv-00095-LK

ORDER ADOPTING IN PART AND DECLINING TO ADOPT IN PART REPORT AND RECOMMENDATION

This matter comes before the Court on the Report and Recommendation ("R&R") of United States Magistrate Judge[1] David W. Christel, Dkt. No. 101, the objections to the R&R by Plaintiff Daniel Jay Perez, Dkt. No. 102, and the response to those objections by Defendants, Dkt. No. 104.[2] The R&R recommends granting Defendants' motion for summary judgment, Dkt. No.

---

[1] The parties repeatedly refer to Magistrate Judge Christel as "the Magistrate" in their objection-phase briefing. Congress adopted the title of "United States Magistrate Judge" several decades ago. Federal Courts Study Implementation Act of 1990, Pub. L. No. 101-650, § 321 (1990). In future filings, the parties should use the appropriate title: Magistrate Judge.

[2] Defendants are Kathryn Grey, Douglas McLane, Michael Wright, Laurence Harrod, Cameron Johnson, Hunter Dire, Stephen Ewing, Jeremy Seeley, Jack Warner, Lisa Anderson, Traci Drake, Melida Ferrell, Kari Styles, Sonia Mills, Karie Rainer, Camden Crouse, and Torey MacLeod. The Court notes that the spelling of certain Defendants' names, including McLane, Crouse, and MacLeod, varies throughout the record and on the docket. The Court uses the spellings reflected in Defendants' DOC email addresses. *See, e.g.*, Dkt. No. 87-1 at 45.

ORDER ADOPTING IN PART AND DECLINING TO ADOPT IN PART REPORT AND RECOMMENDATION - 1

76; *see* Dkt. No. 101 at 18. Having reviewed the R&R, Mr. Perez's objections, Defendants' response, and the remainder of the record—spanning over 1,500 pages—the Court grants in part and denies in part Defendants' motion for summary judgment. Specifically, Mr. Perez's retaliation claims against Grey for filing a fabricated infraction and recommending his transfer survive summary judgment. As to his other claims, the Court reaches the same result as the R&R.

## I.      BACKGROUND

The Monroe Correctional Center ("MCC") is comprised of several separate units including the Special Offenders Unit ("SOU"), which is specifically designated for the treatment and housing of vulnerable adult male incarcerated individuals due to serious and chronic mental illness, or who are seriously mentally ill. *Perez v. Cogburn*, No. 2:18-CV-01800-BAT, 2022 WL 2651620, at *5 (W.D. Wash. July 8, 2022). Each of the six housing units within the SOU provides a specialized treatment setting for incarcerated individuals with multi-disciplinary teams of medical, mental health, and custody staff working together to provide round-the-clock services. *Id.* The goal of the inpatient residential care is to stabilize the incarcerated individual and then transition them to a less restrictive environment within the Department of Corrections ("DOC") prison system until their release. *Id.*

In early 2021, Mr. Perez, an inmate in the SOU, sued several DOC employees. Dkt. No. 5. His operative complaint, filed in July 2021, alleges that 17 DOC employees engaged in retaliation prohibited under the First Amendment when they conducted a "campaign of harassment" against him in response to his protected activity (filing lawsuits, grievances, and other complaints). Dkt. No. 42 at 2–50. Mr. Perez alleges that this harassment campaign was designed to—and did—chill his lawful speech. *Id.* at 48–49. In his complaint, he alleges the following timeline:

- <u>January 22, 2019</u>: Certain Defendants in this action were served with Mr. Perez's complaint

in *Perez v. Cogburn*, No. 2:18-CV-1800-JLR-BAT (W.D. Wash.).[3] That complaint alleged that Defendants were wrongfully denying Mr. Perez his right to refuse anti-psychotic medications. Later that day, Defendant Kathryn Grey, the Correctional Mental Health Unit Supervisor of E-Unit (the unit in which Mr. Perez resided), received an email from ARNP Lamin Sanneh informing her that Sanneh did not believe there was a basis to administer involuntary anti-psychotic medication to Mr. Perez. In response to the email, Grey asked Sanneh to call her. Dkt. No. 42 at 10; *see also* Dkt. No. 94 at 3, 38–39, 42.

- <u>January 25, 2019</u>: Defendants initiated a process to involuntarily medicate Mr. Perez. Dkt. No. 42 at 10; *see also* Dkt. No. 94 at 3.

- <u>February 7, 2019 to March 5, 2019</u>: Mr. Perez was involuntarily medicated with anti-psychotic medication. On March 5, 2019, he won his appeal to discontinue the involuntary medication. Dkt. No. 42 at 11; *see also* Dkt. No. 94 at 3.

- <u>July 2019</u>: Inmates in E-Unit nominated Mr. Perez to serve as Tier Representative—a position that entails "bring[ing] forth unit/facility concerns directly to the Superintendent/designee of the facility[.]" As Tier Representative, Mr. Perez brought "several concerns" to the Superintendent/designees about topics such as the television schedule and noise levels, cell inspections, and lockdowns. Dkt. No. 42 at 11–12; *see also* Dkt. No. 94 at 4–6.

- <u>August 2019</u>: Mr. Perez began making requests to DOC staff to preserve all E-Unit video, emails, kiosk messages, logbook entries, search reports, infractions issued to Mr. Perez, and internal memorandums, in anticipation of Mr. Perez's forthcoming litigation. Dkt. No. 42 at 22.

- <u>August 18, 2019</u>: Mr. Perez reported to Defendant Camden Crouse, Corrections Officer for the MCC-SOU, that inmate Gary Grant had been making sexual comments about Mr. Perez's butt, with the hope that Crouse would speak to Mr. Grant about it so that the comments would stop. *Id.* at 13.

- <u>August/September 2019</u>: Crouse reported the inappropriate comments to Grey, who then initiated a Prison Rape Elimination Act ("PREA") investigation. Upon receiving written notice of the PREA investigation, Mr. Perez told Crouse that he was not asking for a PREA investigation and declined to provide further information. *Id.*; *see also* Dkt. No. 103 at 14.

- <u>September 17, 2019</u>: Crouse notified Mr. Perez that the PREA investigation substantiated his claims about Mr. Grant. The same day, Grey notified Mr. Perez that no infraction would be issued against Mr. Grant because he had agreed to stop and stated that he had only been joking. Subsequently, Mr. Perez complained to the Office of the Corrections Ombuds ("OCO") that DOC staff were not following relevant policy requiring that substantiated PREA investigations be written up as infractions. Dkt. No. 42 at 14–15; Dkt. No. 94-1 at

---

[3] At the time Mr. Perez filed the *Cogburn* action, he named three defendants who he would later sue in this case: Jack Warner, Kathryn Grey, and Lisa Anderson. *See Perez v. Cogburn*, No. 2:18-CV-1800-JLR-BAT, Dkt. No. 1 at 3 (W.D. Wash. Dec. 12, 2018).

ORDER ADOPTING IN PART AND DECLINING TO ADOPT IN PART REPORT AND RECOMMENDATION - 3

1    97; Dkt. No. 103 at 22.

2    • <u>October 2019</u>: Beginning in October 2019, and up until January 2020, Mr. Perez "filed numerous formal and informal complaints related to [his] cell being entered when [he] was not [there.]" Dkt. No. 42 at 21.

3

4    • <u>November 6, 2019</u>: Mr. Perez filed two kites, or written inmate requests, concerning staff's communication toward him and requesting resolution of a prior kite regarding DOC policy related to cell inspections. The first kite specifically named Defendants Douglas McLane (a Corrections Officer at MCC-SOU), Laurence Harrod (a Corrections Officer at MCC-SOU), Michael Wright (also a Corrections Officer at MCC-SOU), and Jeremy Seeley (another Corrections Officer at MCC-SOU). Dkt. No. 42 at 15–16; *see also* Dkt. No. 94 at 6, 8; Dkt. No. 94-1 at 6, 8.

5

6

7

8    • <u>November 10, 2019</u>: Mr. Perez noticed McLane in the unit on a "non-regular workday" and observed him "retrieve two items" from the Sergeant Hale's desk. Dkt. No. 42 at 16; *see also* Dkt. No. 94 at 6; Dkt. No. 94-1 at 10.

9

10   • <u>November 11, 2019</u>: Mr. Perez asked Sergeant Hale to review the unit video camera from the prior day, and Hale confirmed that McLane took Mr. Perez's two kites from Hale's office and told Mr. Perez that it would not happen again. That day, McLane told Mr. Perez that he should not have taken the kites and was reprimanded for doing so. Dkt. No. 42 at 17; *see also* Dkt. No. 94 at 6–7; Dkt. No. 94-1 at 77.

11

12

13   • <u>November 12, 2019</u>: While checking Mr. Perez's cell for "pruno," a type of prison alcohol, Wright and Harrod spilled liquid (a mixture of bleach and water) on Mr. Perez's property. Harrod gave Mr. Perez a thumb's up sign that he could reenter his cell, but did not mention the spill or leave a form indicating a search had been conducted. Mr. Perez "immediately" sought out Hale to report the issue and Hale confirmed liquid was spilled. Harrod later acknowledged the spill but explained that it was "accidental." Dkt. No. 42 at 17–19; *see also* Dkt. No. 94 at 7–8; Dkt. No. 94-1 at 13–36.

14

15

16

17   • <u>November 16, 2019</u>: Mr. Perez learned that while he was at dinner, Defendants Cameron Johnson (a Corrections Officer at MCC-SOU), Hunter Dire (also a Corrections Officer at MCC-SOU), and McLane were seen taking photographs of items in Mr. Perez's cell. They did not leave a form indicating they had done any inspection of Mr. Perez's cell. When Mr. Perez asked about it, Dire and Johnson stated that there was a safety and security concern "about the placement of a 3" by 4" plastic mirror inside [his] cell." Dkt. No. 42 at 19; *see also* Dkt. No. 94 at 8–9; Dkt. No. 94-1 at 42.

18

19

20

21   • <u>November 17, 2019</u>: Dire told Mr. Perez that McLane presented the mirror concern as a reason to enter his cell. Mr. Perez met with Sergeant Hale and asked him to review the video from the prior day. Upon review, Hale said he saw staff taking pictures but not fully entering Mr. Perez's cell. He also found the pictures that were taken. Dkt. No. 42 at 20–22; *see also* Dkt. No. 94-1 at 42, 44–46, 64.

22

23

24   • <u>November 18, 2019</u>: Mr. Perez attended an E-Unit Tier Representative meeting with Grey and Crouse. He complained of being targeted and harassed by staff. Dkt. No. 42 at 22–23;

*see also* Dkt. No. 94 at 46; Dkt. No. 94-1 at 1, 83.

- January 7, 2020: Mr. Perez quit as Tier Representative. Dkt. No. 42 at 24; *see also* Dkt. No. 94 at 10; Dkt. No. 94-1 at 85.

- January 8, 2020: Mr. Perez sent Grey a kite expressing that "he had no other option" but to resign as Tier Representative "because he was being ignored when he attempted to address staff harassment." Dkt. No. 42 at 24; *see also* Dkt. No. 94 at 11; Dkt. No. 94-1 at 89.

- January 21, 2020: Mr. Perez met with Grey to discuss his grievances, cell search reports, and Tier Representative resignation, as well as "[Melida] Ferrell,[4] Crouse, and Sergeant Hale's alleged opinions that [he] is a management problem[.]" During the meeting, Grey allegedly said she would like to focus on issues "that effect the majority of the population on E-unit," and expressed fatigue from responding to Mr. Perez's complaints. Grey reportedly told Mr. Perez that all he does is "retaliate with his pen." When Mr. Perez told her that "eventually the squeaky wheel gets greased," Grey responded, "or it gets recalled." Dkt. No. 42 at 24–25; *see also* Dkt. No. 94 at 11.

- January 22, 2020: Mr. Perez wrote a kite to Grey recapping the meeting and asking her to confirm or correct his notes reflected above. Dkt. No. 42 at 25–26; *see also* Dkt. No. 94 at 12.

- January 24, 2020: Grey responded to Mr. Perez stating, "Not exactly, but you need to reel in the massive amt. of kites, emails, & requests," and "[u]se your time wisely." Dkt. No. 42 at 26; *see also* Dkt. No. 5-1 at 2; Dkt. No. 94 at 12; Dkt. No. 94-1 at 95 (kite and response).

- February 2020: COVID-19 protocols began in Mr. Perez's unit, and as things progressed, Mr. Perez "made a few complaints to the [Director of the OCO]," Joanna Carns, regarding staff's non-compliance with these protocols. Dkt. No. 42 at 27–28.

- May 2020: Mr. Perez met with Ms. Carns in person and relayed his concerns regarding staff's non-compliance with COVID-19 protocols. At some point, Grey requested that Mr. Perez not be allowed to speak to Ms. Carns. *Id.* at 28; *see also* Dkt. No. 94-1 at 196 (C.O. Lewis's kite response stating: "In May when the ombuds lady came out to talk to offenders on unit Kathy Grey asked them to not talk to Mr. Perez.").

- June 19, 2020: Grey held a "Town Hall Meeting" regarding COVID-19 measures, during which Mr. Perez asked a question about ice porters that was "met with hostility." Mr. Perez asked to speak with Grey after the town hall. In their meeting, Grey "relayed that all [Mr. Perez] does is seek perfection and staff are doing their best." In addition, she "further expressed that she wanted to move [Mr. Perez] to another unit." Mr. Perez stated that he was "not mentally fit enough" for such a move, and that Grey responded that she "could pull strings" to have him moved. Dkt. No. 42 at 28–30; *see also* Dkt. No. 94 at 13–14.

---

[4] Ferrell is a Correctional Unit Supervisor at MCC-SOU.

- <u>June 26, 2020</u>: Grey falsely told Allison Lewis that Mr. Perez filed a complaint against her for eating and drinking too much so that she did not have to wear her protective face covering as required by COVID protocols. When asked by Lewis about the grievance, Mr. Perez stated that it was made by Mr. Chen, the Tier Representative. Dkt. No. 42 at 30; *see also* Dkt. No. 94 at 14–15. Mr. Perez then sent several kites to Lewis relating to Grey's misinformation to Lewis.

  o <u>June 26, 2020</u>: In response to the question "Has K. Grey and/or CC3 C. Crouse ever[] expressed to you that I complain too much and/or write too many grievances?" Lewis writes, "Kathy Grey has along with Crouse [said] that you grieve everything [and] complain about everything. Kathy said during townhall that she is sick of you after listening to other people's concerns during townhall meetings." Dkt. No. 5-1 at 9; *see also* Dkt. 87 at 11; Dkt. No. 94-1 at 200, 202 ("Kathy Grey has told me personally she never wants to deal with you or any complaint you bring forth. During townhall she said infront [sic] of you [and] me [and] other offenders that she was sick of you and you can pick anywhere you want to go so you are off the unit.").

  o <u>June 29, 2020</u>: Lewis answers in the affirmative to the questions "is it safe to say that [Grey's misinformation about the COVID/eating complaint] was intended to sow discontent and stoke the fire in an attempt to make staff angry at me?"; "is it safe to say that this in-line [sic] with Ms. Grey's previous statements that she is attempting to protect staff from me being 'AN ISSUE' as a pretext to get me off this unit?"; and "[i]s it also safe to say that Ms. Grey's animus towards [me] is a means to encourage staff to single me out as they will have Ms. Grey's support as she wants to get rid of me?" Dkt. 5-1 at 13. Lewis adds that Grey's "animus" started about a year prior "due to [Mr. Perez] asking about issues on unit to get fixed which in Kathy's words creates too much work for her." Dkt. No. 87 at 11; Dkt. No. 94-1 at 204; *see also id.* at 210.

- <u>June 19, 2020</u>: Grey began concerted efforts to move Mr. Perez to another unit. Dkt. No. 42 at 31–32, 34, 41, 44, 47.

- <u>July 16, 2020</u>: Mr. Perez filed an employee conduct complaint alleging that Grey was retaliating against him for making complaints. Ferrell investigated this complaint and "narrowed the scope of [it] significantly." Dkt. No. 42 at 32; *see also* Dkt. No. 94 at 17; Dkt. No. 94-1 at 224–27 ("I was precluded from providing the details necessary to adequately investigate my complaint in its totality.").

- <u>August 10, 2020</u>: Another inmate assaulted Mr. Perez and others threatened him, and a staff member who was present "did nothing." Dkt. No. 42 at 32.

- <u>August 11, 2020</u>: Mr. Perez filed a formal complaint with the OCO "regarding the hostile living environment that Defendant Kathryn Grey has encouraged by her lack of supervision and inactions to complaints brought by Plaintiff." *Id.* at 32–33.

- <u>August 14, 2020</u>: Mr. Perez was moved to another pod in his unit because the individual who assaulted him had moved back from segregation. As a result of the move, he was

unable to rejoin a cat program he had been part of for years. *Id.* at 35.

- <u>August 28, 2020</u>: Grey submitted "a serious infraction report (falsely) claiming [Mr. Perez] had provided false information" to an Ombuds, "leading to an innocent person being proceeded against or penalized." *Id.*; *see also* Dkt. No. 94 at 17 (asserting that the infraction report was served on September 1, 2020).

- <u>September 23, 2020</u>: Mr. Perez attended his serious infraction hearing related to Grey's infraction report and was found guilty by Defendant Stephen Ewing, a Corrections Specialist at MCC. Ewing sanctioned Mr. Perez to 10 days of cell confinement, 15 days of loss of dayroom access, and 15 days of loss of store/commissary, to begin the following day. Mr. Perez appealed the findings. Dkt. No. 42 at 36–37; *see also* Dkt. No. 94-1 at 308–11, 337–39; Dkt. No. 94 at 17.

- <u>September 25, 2020</u>: Crouse and another staff member confiscated Mr. Perez's "BLM" face mask, allegedly at Grey's direction, and a Behavior Observation Entry ("BOE") was placed in his DOC file. Mr. Perez told the staff that the DOC had approved decorations, but Grey explained that BLM is "considered controversial by some staff and a political statement." Mr. Perez filed a resolution request in response and also challenged the BOE entry in his file. Dkt. No. 42 at 37–38; *see also* Dkt. No. 93 at 25 and Dkt. No. 94 at 20 (noting that the BOE remained on Mr. Perez's record until July 2021, several months after "headquarters" required the BOE to be removed); Dkt. No. 94-1 at 341 (kite); *id.* at 347–48 (kite); *id.* at 350 (kite); *id.* at 516 (search report); *id.* at 525–551 (grievance and appeal documents); *id.* at 531 (February 9, 2021 Level II response stating that the BOE should be removed and that per current policy, plain surgical masks are required); *id.* at 547–48 (March 22, 2021 Level III response confirming that the BOE should be removed and stating that Mr. Perez "should have been allowed to retain and wear the face covering with BLM marking on it," but that "the confiscation of the mask and subsequent BOE [was] from misinterpretation of the [DOC] directive and not an intentional attack" on Mr. Perez's speech).

- <u>October 5, 2020</u>: During mail call, Mr. Perez observed mail noted as having been attempted to be delivered three times, and after pointing it out to another inmate, Seeley stated: "What you think I fuck with your mail? I don't care enough to give a fuck about your mail." Later that day, Seeley delayed Mr. Perez getting to dinner by 15 minutes. Dkt. No. 42 at 38–39; *see also* Dkt. No. 94 at 20; Dkt. No. 94-1 at 352.

- <u>October 6, 2020</u>: At Mr. Perez's request, Sergeant Patrick reprimanded Seeley for the prior day's events. The same day, Mr. Perez tried to send out legal mail, but Seeley and Johnson did not follow proper policy, preventing him from sending his mail. Mr. Perez filed a resolution request following this incident. Dkt. No. 42 at 39–40; *see also* Dkt. No. 94 at 20–22; Dkt. No. 94-1 at 354, 355–58 (Level I response and investigation stating "staff reported that they were confused with the Outgoing Legal Mail process" and "[t]here is no evidence to support that staff refused to process your legal mail, only that they did not comply with set procedures and this has been addressed" through instructing them on how the legal mail log is to be completed); *id.* at 366 ("[B]ringing your complaint forward resulted in current and uniform adherence to policy by SOU E Unit officers").

- <u>December 14, 2020</u>: On appeal, Defendant Jack Warner—the Superintendent of the MCC-SOU—dismissed Mr. Perez's serious infraction from September 2020, stating that he saw "no evidence to support false information" to the Ombuds. Dkt. No. 42 at 41; Dkt. No. 94-1 at 312–15; *see also* Dkt. No. 94 at 23; Dkt. No. 94-1 at 388 (OCO letter noting that it was "able to substantiate [Mr. Perez's] concerns through [its] review of video and documents," which indicated that he did not provide false information).

- <u>January 26, 2021</u>: Mr. Perez filed the instant lawsuit. Dkt. No. 1.

- <u>February 10, 2021</u>: Mr. Perez attended his yearly risk management team meeting. The team decided that he would "retain MI3 custody and be retained at MCC-SOU E-unit to continue mental health treatment at RTU [Residential Treatment Unit] level of care." Dkt. No. 42 at 42; *see also* Dkt. No. 94 at 23.

- <u>February 23, 2021</u>: Grey, Wright, Johnson, McLane, and Ewing were served with Mr. Perez's complaint in this case. Dkt. No. 42 at 43; *see also* Dkt. No. 94 at 24 (asserting that service occurred between February 23 and February 26, 2021).

- <u>February 24, 2021</u>: Mr. Perez overheard Johnson say to Mr. Grant, the subject of the PREA investigation, "don't worry we'll get rid of him." Dkt. No. 42 at 43; *see also* Dkt. No. 94 at 25.

- <u>February 25, 2021</u>: Defendant Traci Drake, Chief of Psychology at MCC, contacted Dr. Marlinda Pruden, Mr. Perez's therapist, inquiring "why [Mr. Perez] could not be transferred to another facility." Dr. Pruden noted in a reverse kite to Mr. Perez, and separately to Dr. Drake, that she was opposed to his transfer. Dkt. No. 42 at 43–44; *see also* Dkt. No. 94 at 25.

- <u>March 1, 2021</u>: Grey and Dr. Drake called an administrative meeting to discuss transferring Mr. Perez because of his complaints. In attendance were Defendants Grey, Dr. Drake, Warner, Lisa Anderson (Associate Superintendent of the MCC-SOU), Kari Styles (Correctional Unit Supervisor for the MCC-SOU), and Torey MacLeod (Corrections Officer for the MCC-SOU), as well as nonparties Dr. Pruden and Rachel Symon. Later that day, Mr. Perez met with Dr. Pruden and she told him that her hands were tied regarding his transfer and that she could only delay the move. Dr. Pruden also requested to Defendant Karie Rainer, the Mental Health Director at the DOC Headquarters in Olympia, that Mr. Perez's case be submitted to the Mental Health Teleconference. Dkt. No. 42 at 44–45; *see also* Dkt. No. 94 at 25–26 (asserting that Defendants Crouse and Sonia Mills (a Classification Counselor at MCC-SOU) also attended the meeting); Dkt. No. 94-1 at 422 (listing attendees).

- <u>March 4, 2021</u>: Dr. Pruden submitted a Mental Health Update to the Mental Health Teleconference for the "possibility of transfer." Dkt. No. 42 at 45–46; *see also* Dkt. No. 94 at 26.

- <u>March 9, 2021</u>: Disability Rights of Washington attorney advocate Rachael Seevers held a teleconference with Dr. Rainer and Anderson to discuss Mr. Perez's possible transfer, and

Anderson stated that the reason Mr. Perez was being recommended for transfer was because of his complaints and litigation. That day, Mr. Perez was approved for transfer to general population by the Mental Health Teleconference. Dkt. No. 42 at 46; *see also* Dkt. No. 94 at 26; Dkt. No. 94-1 at 408 (Seevers letter to Mr. Perez stating that Anderson and Dr. Rainer "informed [her] that [Mr. Perez] had named particular custody staff in [his] lawsuit and that custody staff was uncomfortable being named defendants," and that "Anderson advised [her] that custody staff would like [Mr. Perez] off the unit because they were frustrated with [his] litigation and use of the grievance system.").

- March 11, 2021: Mr. Perez attended another risk management team meeting with Grey, Crouse, and Mills, during which the team noted that he had been approved for transfer to general population. Dkt. No. 42 at 47; *see also* Dkt. No. 94 at 27 (asserting that Dr. Pruden and Defendant Crouse also attended); Dkt. No. 94-1 at 396 (DOC document indicating that Mr. Perez was discharged from RTU level of care).

At the time of filing the operative complaint in July 2021, Mr. Perez had not been transferred out of E-Unit. Dkt. No. 42 at 47. However, subsequent filings indicate that Mr. Perez was moved to F-Unit on August 12, 2021. Dkt. No. 77 at 1.

## II.   DISCUSSION

The Court reviews de novo those portions of the R&R "to which objection is made," and "may accept, reject, or modify, in whole or in part, the recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1); *see also* Fed. R. Civ. P. 72(b)(3) (the Court "must determine de novo any part of the magistrate judge's disposition that has been properly objected to."). Mr. Perez objects to the entirety of the R&R on the grounds that "the Magistrate [Judge] failed to address overwhelming relevant evidence" that Defendants "use[d] normally valid procedures as subterfuge for their retaliatory motives," and generally faults the R&R for "taking Defendant[s'] version of events as truth" rather than refraining from weighing the evidence. Dkt. No. 102 at 3, 7.

### A.   Scope of the Record

The Court first clarifies the evidence that it may consider in ruling on a motion for summary judgment. *See* Dkt. No. 101 at 3 (discussing evidence that may be considered at summary judgment). The Court may "consider admissible evidence," *Weil v. Citizens Telecom Servs. Co.*,

*LLC*, 922 F.3d 993, 998 (9th Cir. 2019), as well as "unauthenticated evidence . . . if the evidence can 'be presented in a *form* that would be admissible' at trial," *Harlow v. Chaffey Cmty. Coll. Dist.*, No. 21-55349, 2022 WL 4077103, at *1 (9th Cir. Sept. 6, 2022) (emphasis in original) (quoting Fed. R. Civ. P. 56(c)(2)); *see also Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010) (cautioning district courts to "avoid applying summary judgment rules strictly" against pro se inmates); *Aholelei v. Haw., Dep't of Pub. Safety*, 220 F. App'x 670, 672 (9th Cir. 2007) (district court abused its discretion in not considering plaintiff's evidence at summary judgment, "which consisted primarily of litigation and administrative documents involving another prisoner and letters from other prisoners" that could have been made admissible at trial). Although the Court does not consider hearsay that is not subject to a hearsay exception (such as a statement by a party opponent under Federal Rule of Evidence 801(d)(2) or statements going to the declarant's state of mind under Rule 803(3) related to motive, intent, and plan), Defendants have otherwise failed to show that the contested documents cannot be presented in a form that would be admissible at trial. *See* Fed. R. Civ. P. 56(c)(2).[5] The Court therefore considers this evidence in its review of Judge Christel's R&R and the underlying record.

However, the Court does not consider the new allegations Mr. Perez raises for the first time in his responsive briefing. For example, in his opposition to Defendants' motion for summary judgment, Mr. Perez advances new claims regarding a spring 2021 BLM mask confiscation. *See* Dkt. No. 94 at 31. A litigant "may not effectively amend [his] Complaint by raising a new theory . . . in [his] response to a motion for summary judgment." *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1089 (9th Cir. 2010); *see also Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006) ("Simply put, summary judgment

---

[5] The Court also notes that Defendants rely on some of the emails they seek to strike. *See, e.g.*, Dkt. No. 98 at 4 (quoting email attached to Seevers declaration).

is not a procedural second chance to flesh out inadequate pleadings." (internal quotation marks omitted) (quoting *Fleming v. Lind-Waldock & Co.*, 922 F.2d 20, 24 (1st Cir. 1990))); *Cogburn*, 2022 WL 2651620, at *14 n.8, *22 n.17 (declining to consider new allegations made in Mr. Perez's opposition brief that were not included in his operative complaint). The Court also does not entertain Mr. Perez's new theory of retaliation via conspiracy, raised for the first time in his objections. Dkt. No. 102 at 10–11; *see also Tejada v. Delbaso*, No. 3:18-CV-1096, 2022 WL 1275777, at *2 (M.D. Pa. Apr. 28, 2022) (a plaintiff cannot "raise a new legal theory for the first time in objections to a report and recommendation or otherwise amend a complaint in his objections.").

One matter remains with respect to the scope of the record. On April 14, 2022, Mr. Perez filed a motion seeking leave to amend exhibits attached to his January 27, 2022 declaration in opposition to Defendants' motion for summary judgment. Dkt. No. 103. Defendants do not oppose the motion, and the Court grants it. *See* LCR 7(b)(2).

**B.     Legal Standard for First Amendment Retaliation Claims**

Section 1983 provides a remedy for constitutional violations committed by state actors. In this case, Mr. Perez claims that government officials retaliated against him for exercising his constitutional rights. Importantly, government actions that standing alone do not violate the Constitution may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right. *See, e.g., Crawford–El v. Britton,* 523 U.S. 574, 578–79 (1998) (misdirection of personal belongings may state a claim of retaliation for exercise of First Amendment rights); *Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 671, 685 (1996) (nonrenewal of plaintiff's government contract in retaliation for his exercise of free speech is actionable); *Perry v. Sindermann*, 408 U.S. 593, 597 (1972) ("[I]f the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of

those freedoms would in effect be penalized and inhibited.").

First Amendment rights, like many other rights, are circumscribed in the prison setting. *See, e.g., Pell v. Procunier,* 417 U.S. 817, 822 (1974) ("[A] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system."). However, it is well-established that prisoners have a constitutional right to file prison grievances and to pursue civil rights litigation in the courts. *See, e.g., Lewis v. Casey*, 518 U.S. 343, 350–54 (1996); *Shepard v. Quillen*, 840 F.3d 686, 688 (9th Cir. 2016); *Rhodes v. Robinson*, 408 F.3d 559, 567 (9th Cir. 2005). This right is grounded in the First Amendment's protection of the right "to petition the Government for a redress of grievances." U.S. Const. amend. I. "[B]ecause purely retaliatory actions taken against a prisoner for having exercised those rights necessarily undermine those protections, such actions violate the Constitution quite apart from any underlying misconduct they are designed to shield." *Rhodes*, 408 F.3d at 567.

A First Amendment retaliation claim has five elements. First, the plaintiff must demonstrate that the retaliated-against conduct is protected. *Watison v. Carter*, 668 F.3d 1108, 1114 (9th Cir. 2012). Second, the plaintiff must show the defendant took adverse action against the plaintiff. *Rhodes*, 408 F.3d at 567. Adverse action taken against an inmate "need not be an independent constitutional violation. The mere threat of harm can be an adverse action." *Watison*, 668 F.3d at 1114 (cleaned up). Third, the plaintiff must establish a causal connection between the adverse action and the protected conduct. *Id.* To raise a triable issue as to retaliatory motive, the plaintiff must offer either direct or circumstantial evidence of such motive. *McCollum v. Cal. Dep't of Corr. & Rehab.*, 647 F.3d 870, 882 (9th Cir. 2011). Circumstantial evidence of retaliatory motive can include (1) proximity in time between protected speech and the alleged retaliation; (2) evidence that the defendant expressed opposition to the speech; or (3) other evidence that the

reasons given by the defendant for the adverse action were false and pretextual. *Id.* Fourth, the plaintiff must show that the "official's acts would chill or silence a person of ordinary firmness from future First Amendment activities." *Rhodes*, 408 F.3d at 568 (internal quotation marks and emphasis omitted). This element can be proven by demonstrating the plaintiff "suffered some other harm," *Brodheim v. Cry*, 584 F.3d 1262, 1269 (9th Cir. 2009), that is "more than minimal," *Rhodes*, 408 F.3d at 567 n.11. Finally, the plaintiff must show "that the prison authorities' retaliatory action did not advance legitimate goals of the correctional institution or was not tailored narrowly enough to achieve such goals." *Rizzo v. Dawson*, 778 F.2d 527, 532 (9th Cir. 1985); *see also Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 2005).

Retaliation claims brought by prisoners must be evaluated in light of concerns over "excessive judicial involvement in day-to-day prison management, which 'often squander[s] judicial resources with little offsetting benefit to anyone.'" *Pratt*, 65 F.3d at 807 (alteration in original) (quoting *Sandin v. Conner*, 515 U.S. 472, 482 (1995)). In particular, courts should "'afford appropriate deference and flexibility' to prison officials in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory." *Id.* (quoting *Sandin*, 515 U.S. at 482).

## C.   Mr. Perez's Grievances and Other Complaints Are Protected Under the First Amendment

"Inmates must be able to complain about staff; doing so provides a crucial check against those who are in a position to abuse them." *Shepard*, 840 F.3d at 692–93. Although First Amendment protections do not extend to frivolous complaints, they do extend to "arguable" ones. *Lewis*, 518 U.S. at 353 n.3 ("Depriving someone of an arguable . . . claim inflicts actual injury because it deprives him of something of value—arguable claims are settled, bought, and sold. Depriving someone of a frivolous claim, on the other hand, deprives him of nothing at all, except

1    perhaps the punishment of Federal Rule of Civil Procedure 11 sanctions."). Troublingly,

2    Defendants argue that Mr. Perez "relentlessly disrupted daily activities," but provide no support

3    for this proposition other than his submission of numerous, non-frivolous complaints. Dkt. No.

4    101 at 10–11; *see also* Dkt. No. 28 at 2–3 ("Perez has studied the regulations and policies

5    meticulously" and "[s]taff on E Unit is reluctant to interact with [him] out of a desire to avoid an

6    argumentative confrontation or having to endure another complaint against themselves over a

7    procedural irregularity.").

8        The Court has found no authority—and Defendants cite none—for the proposition that

9    non-frivolous complaints lose their constitutional protection at a certain volume. Although

10   Defendants complain that Mr. Perez's complaints are "excessive[]," Dkt. No. 101 at 10 (quoting

11   Dkt. No. 28 at 2), the record suggests that they are usually at least "arguable," if not meritorious.

12   *See, e.g.*, Dkt. No. 94-1 at 547–48 (Level III response to grievance finding that "the July 10, 2020

13   memo [regarding face masks] was not followed correctly, although not intentionally or to cause

14   specific harm to [Mr. Perez].''); Dkt. No. 5-1 at 39 (Level III Response [regarding cell searches]

15   stating that "the policy does leave room for interpretation in regards to these types of searches[;] a

16   request has been made to add specific language concerning expectations of staff."). The Court

17   concludes that Mr. Perez's grievances—whether in the form of kites, resolution requests,

18   grievances, or lawsuits—are protected activity. Accordingly, the Court's analysis in the

19   subsequent sections focuses on whether Mr. Perez has presented an issue for trial on the other four

20   elements of his retaliation claim.

21   **D.    Grey Is Not Entitled to Summary Judgment on Mr. Perez's Claim Relating to the WAC 552 Infraction Report**

22
         Mr. Perez objects to the R&R's finding that he failed to meet his burden of "proving" that

23   Grey and Ewing violated his constitutional rights by infracting him for false reporting. Dkt. No.

24

1    101 at 13; Dkt. No. 102 at 17–20.

2            Grey submitted the "WAC 552" infraction report on or about August 28, 2020, asserting

3    that Mr. Perez provided false information to an Ombuds, resulting in an innocent person (fellow

4    inmate Robert Nabayan) being proceeded against or penalized. Dkt. No. 42 at 35; *see also* Dkt.

5    No. 94 at 17 (asserting that the infraction report was served on September 1, 2020); Dkt. No. 94-

6    1 at 312. Ewing found Mr. Perez guilty of the infraction on September 23, 2020, and sanctioned

7    him with 10 days of cell confinement, 15 days of loss of dayroom access, and 15 days of loss of

8    store/commissary. Dkt. No. 94-1 at 337–39. Mr. Perez appealed the findings, but it was not until

9    December 14, 2020—long after the sanctions were carried out—that Warner dismissed the

10   infraction. *See* Dkt. No. 94-1 at 312–13. Warner specifically found that there was "no evidence to

11   support [that Mr. Perez gave] false information" to the Ombuds. Dkt. No. 94-1 at 312; *see also id.*

12   at 314 ("Nothing in this packet supports WAC 552"); Dkt. No. 94 at 22–23; Dkt. No. 94-1 at 388

13   (OCO letter noting that it was "able to substantiate [Mr. Perez's] concerns").

14           Mr. Perez's infraction claim against Ewing fails at the third element necessary to establish

15   retaliation: causation. To survive summary judgment, a plaintiff must "put forth evidence of

16   retaliatory motive, that, taken in the light most favorable to him, presents a genuine issue of

17   material fact as to [Defendants'] intent" in taking the adverse actions. *Bruce* v. *Ylst*, 351 F.3d 1283,

18   (9th Cir. 2003). Although Mr. Perez has many qualms with Ewing and the way he ran the hearing,

19   *see* Dkt. No. 94-1 at 308–11, he fails to put forth any evidence that Ewing had a retaliatory motive.

20           Not so with respect to Grey. Mr. Perez has submitted evidence that she intended to transfer

21   him out of her unit for filing grievances and other legal complaints, and that the WAC 552

22   infraction potentially served as pretext for the planned transfer.

23           In a June 26, 2020 kite response to Mr. Perez, Corrections Officer Lewis reported that Grey

24   expressed that "[Mr. Perez] grieve[s] everything [and] complain[s] about everything," "she is sick

ORDER ADOPTING IN PART AND DECLINING TO ADOPT IN PART REPORT AND RECOMMENDATION
- 15

of [him]," and "[he] can pick anywhere [he] want[s] to go so [he is] off the unit." Dkt. No. 5-1 at 9; Dkt. No. 87 at 11; Dkt. No. 94-1 at 200, 202. On June 29, 2020, Lewis also answered in the affirmative to the following kite questions from Mr. Perez: "is it safe to say that this is in-line [sic] with Ms. Grey's previous statements that she is attempting to protect staff from me being 'AN ISSUE' as a pretext to get me off this unit?"; and "[i]s it also safe to say that Ms. Grey's animus towards [me] is a means to encourage staff to single me out as they will have Ms. Grey's support as she wants to get rid of me?" Dkt. No. 5-1 at 13; *see also* Dkt. No. 94-1 at 210. Lewis added that Grey's "animus" started about a year prior "due to [Mr. Perez] asking about issues on unit to get fixed which in [Grey]'s words creates too much work for her." Dkt. No. 87 at 11; Dkt. No. 94-1 at 204 (same).

Just days after Grey submitted the WAC 552 infraction, in a September 2, 2020 kite response, Dr. Pruden confirmed that Grey was seeking to transfer Mr. Perez to the Walla Walla RTU and that the rationale for the transfer was "grievances as well as the alleged infraction behavior WAC 552." Dkt. No. 94-1 at 234. And when asked during an incident review about this time period in September 2020, Dr. Pruden stated that "[t]here was a lot of pressure from Kathy (Grey) and Lisa (Anderson)" to transfer Mr. Perez, despite Dr. Pruden's opposition to the transfer. Dkt. No. 87 at 17. In October 2020, Dr. Pruden again confirmed during an investigation that the reasoning behind the transfer was that Mr. Perez was "tak[ing] up excessive amounts of staff times through grievances and complaints." Dkt. No. 94-1 at 244. The same month, Crouse told the investigator that "[h]e ha[d] heard CMHUS [Grey] express[] concern over the amount of grievances that I/Perez files and the time it takes to manage I/I Perez." *Id.*

Notably, Mr. Perez stated in his appeal of the WAC 552 infraction that "[t]he events that [he] reported to the ombuds actually took place and were caught on camera," Dkt. No. 94-1 at 309, and the final letter from the OCO states that it was "able to substantiate [Mr. Perez's] concerns

through [its] review of video and documents," *id.* at 388. This video substantiating the information Mr. Perez gave to the Ombuds was presumably available to Grey before she filed the infraction. *See* Dkt. No. 42 at 34. And again, the finding on appeal was that there was "no evidence" that Mr. Perez gave false information to the Ombuds. Dkt. No. 94-1 at 312–15.

In sum, Mr. Perez has submitted sufficient evidence to create a genuine issue of material fact as to whether Grey had a retaliatory motive for filing the WAC 552 infraction. *See Austin v. Terhune*, 367 F.3d 1167, 1170–71 (9th Cir. 2004) (recognizing Section 1983 retaliation claim where prisoner alleged that correctional officer falsely accused prisoner of misconduct in retaliation for prisoner's earlier reporting of the officer's misconduct); *Bledsoe v. Martinez*, No. 2:18-CV-2710-KJM-KJNP, 2022 WL 2992822, at *10 (E.D. Cal. July 27, 2022) ("Falsification of a report is deemed a retaliatory act in and of itself."), *report and recommendation adopted*, 2022 WL 4130712 (E.D. Cal. Sept. 12, 2022).

With respect to the other elements of Mr. Perez's retaliation claim, Defendants' argument that the infraction and its attendant consequences do not constitute an adverse action, Dkt. No. 76 at 9, is meritless. Ten days of cell confinement, 15 days of loss of dayroom access, and 15 days of loss of store/commissary is more than minimal harm—and such harm "will almost always have a chilling effect." *See Entler v. Gregoire*, No. 2:12-CV-5141-TOR, 2019 WL 3022190, at *4 (E.D. Wash. July 10, 2019) (five days of cell confinement, fifteen days of lost yard/gym time, and a warning not to badger Washington State Penitentiary employees was "more than minimal" harm (citing *Rhodes*, 408 F.3d at 567 n.11). That Mr. Perez's infraction was ultimately dismissed is beside the point: the inquiry is whether the adverse action—here, imposing an infraction and sanctions—"would chill or silence a person of ordinary firmness from future First Amendment activities." *Brodheim*, 584 F.3d at 1271 (cleaned up); *see also Richey v. Stemler*, No. 2:19-CV-00769-RAJ, 2021 WL 322708, at *2 (W.D. Wash. Feb. 1, 2021) (when an infraction was dismissed

on appeal and was no longer on Plaintiff's record, it was a question of fact "[w]hether this would have chilled the First Amendment rights of a person of ordinary firmness"). Defendants further assert that "[i]t is a legitimate penological interest to attempt to prevent inmates from falsely accusing other inmates of misconduct," Dkt. No. 76 at 7, but they "may not defeat a retaliation claim on summary judgment simply by articulating a general justification for a neutral process, when there is a genuine issue of material fact as to whether the action was taken in retaliation for the exercise of a constitutional right," *Bruce*, 351 F.3d at 1289. Such issues of material fact preclude summary judgment here.

Taking the evidence in the light most favorable to Mr. Perez, a reasonable juror could conclude that Grey filed a groundless infraction against him to manufacture a pretextual reason to transfer him in retaliation for his grievances.

**E.    Defendants Other Than Grey Are Entitled to Summary Judgment on Mr. Perez's Retaliatory Transfer Claim**

Mr. Perez objects to the R&R's finding that he failed to meet his burden to show that Defendants who participated in the decisions to transfer him out of the E-Unit (Grey, Dr. Drake, Warner, Anderson, Styles, Crouse, Mills, and MacLeod) did so in retaliation for his protected activity. Dkt. No. 102 at 10. The Court adopts the R&R's recommendation to grant summary judgment on this claim as to all Defendants listed below, but declines to adopt the recommendation with respect to Grey.

1.    Mr. Perez has not adequately alleged that Defendants Warner, Anderson, Ferrell, Styles, Rainer, Drake, Mills, Crouse, or MacLeod were individually involved in the alleged retaliatory transfer

Defendants argue that Mr. Perez has failed to adequately allege personal involvement of Defendants other than Grey in the transfer decision. Dkt. No. 76 at 12; Dkt. No. 98 at 8–9. The Court agrees.

ORDER ADOPTING IN PART AND DECLINING TO ADOPT IN PART REPORT AND RECOMMENDATION - 18

1    Although Mr. Perez contends in his opposition brief that Defendants Warner, Anderson,

2    Ferrell, Styles, Rainer, Drake, Mills, Crouse, and MacLeod "failed to intervene in Defendant

3    Grey's unlawful actions," allowed Grey to "unlawfully threaten to transfer Mr. Perez," and

4    "participat[ed] in" the transfer, Dkt. No. 93 at 7, these allegations are not in his complaint. Nor is

5    his theory that these Defendants conspired together to transfer him. Dkt. No. 102 at 10–11. Again,

6    a plaintiff may not amend his complaint via opposition brief or objections. And to state a claim

7    under Section 1983, the plaintiff must allege that each defendant "personally played a role in

8    violating the Constitution." *Hines v. Youseff*, 914 F.3d 1218, 1228 (9th Cir. 2019); *Starr v. Baca*,

9    652 F.3d 1202, 1205 (9th Cir. 2011) ("culpable action, or inaction" must be "directly attributed

10   to" each defendant). Mr. Perez's complaint fails to attribute culpable action or inaction to each

11   Defendant as Section 1983 requires. *See generally* Dkt. No. 42. Accordingly, these Defendants are

12   entitled to summary judgment on this claim. However, the Court finds otherwise with respect to

13   Grey.

14          2.    Mr. Perez has established a triable issue regarding whether Grey's efforts to transfer
              him were an adverse action

15   Grey contends that no "actionable retaliation" exists in relation to Mr. Perez's transfer

16   because her efforts to get him transferred to another unit do not constitute an adverse action. That

17   is not necessarily so.

18   Efforts to transfer an inmate to another unit can be an adverse action where they have

19   foreseeable, negative effects on the inmate that would chill a person of ordinary firmness from

20   future First Amendment activities. *See Karban v. Baltierra*, No. 21-15548, 2022 WL 1636751, at

21   *1 (9th Cir. May 24, 2022) (summary judgment was improper on prisoner's claim that the deputy

22   warden retaliated against his grievances by requesting a lateral transfer to a similar housing unit);

23   *Jay v. Rodriguez*, No. 6:22-CV-00469-SB, 2022 WL 17834314, at *3 (D. Or. Nov. 14, 2022)

24

ORDER ADOPTING IN PART AND DECLINING TO ADOPT IN PART REPORT AND RECOMMENDATION
- 19

(because "the interest cognizable in a retaliation claim is the right to be free of conditions that would not have been imposed but for the alleged retaliatory motive," inmate adequately pleaded an adverse action by alleging that his transfer to a different unit "would not have ever happened had he not participated in his right to the protected conduct" (cleaned up)), *report and recommendation adopted*, 2022 WL 17832214 (D. Or. Dec. 21, 2022). "[T]he fact that inmates have no right to [particular housing] is irrelevant" because the claim is not that the inmate has such a right, but instead that the transfer "was the 'adverse action' taken in retaliation for his filing of grievances." *Garcia v. Smith*, 666 F. App'x 581, 585 (9th Cir. 2016); *see also Pratt*, 65 F.3d at 806 ("To succeed on [a] retaliation claim, [a plaintiff] need not establish an independent constitutional interest in either assignment to a given prison or placement in a single cell, because the crux of his claim is that state officials violated his *First Amendment* rights by retaliating against him for his protected speech activities." (emphasis original)); *Stetson v. Wash. Dep't of Corr.*, No. C15-5524-BHS-KLS, 2017 WL 2485198, at *8 (W.D. Wash. Apr. 7, 2017) ("While there may be no constitutional right to remain in a specific cell, a cell transfer—if done in retaliation for exercising a constitutionally protected right—can be an adverse action."), *report and recommendation adopted*, 2017 WL 2483528 (W.D. Wash. June 8, 2017).

Here, Mr. Perez has submitted evidence that his transfer would (or did) result in at least the following harm:

1. Premature termination of his positive and productive therapist-client relationship with seemingly no clinical justification.[6]

---

[6] *See, e.g.*, Dkt. No. 94 at 34; Dkt. No. 87-1 at 62 (Dr. Pruden stating that she has doubts about Mr. Perez's ability to trust a new provider, and "trust has been key to his progress thus far in assisting him to adhere to treatment. Therefore I don't believe that a transfer to SOU F unit is the best option."); Dkt. No. 87 at 17 (Dr. Pruden stating that "[t]he push from the room" in the March 2021 meeting regarding Mr. Perez was to "get him out of here," and that "[w]hile it was a consensus, I don't necessarily agree with it"; "I felt like I was pushed into a corner as a clinician"); Dkt. No. 87-1 at 54–55 (July 24, 2021 email from Alicia St. John, Correctional Mental Health Counselor 2, to Anderson, Dr. Rainer,

ORDER ADOPTING IN PART AND DECLINING TO ADOPT IN PART REPORT AND RECOMMENDATION - 20

2.  Loss of a job in the E-Unit and resulting incurrence of debt to pay his legal expenses. Dkt. No. 94 at 34 ("As a result of my transfer to F-unit I lost my unit job in wh[ich] I was paid approximately $25.00-38.00 a month. . . . I used these funds to pay my legal copy cost, legal mail costs, and other legal expenses. I now have to incur an institutional debt.").

Taking this evidence in the light most favorable to Mr. Perez, a reasonable juror could conclude that an ordinary prisoner's First Amendment activity would be chilled if the mental health unit supervisor sought his transfer out of the unit in response to his protected activity.

3.  <u>Mr. Perez has also established an issue for trial as to whether there was a causal connection between his protected activities and Grey's efforts to get him transferred, and as to whether such efforts would chill an ordinary inmate's protected activity</u>

Grey next argues that Mr. Perez cannot show a causal connection between her efforts to transfer him and his protected conduct because (1) she did not have the power to unilaterally transfer him; and (2) she did not make any "direct" threat of transfer to Mr. Perez. *See* Dkt. No. 76 at 7; Dkt. No. 98 at 5; Dkt. No. 104 at 2.

But an inmate need not show that a state actor has unilateral power to take a certain action or that she made a direct threat to do so, as long as the inmate shows that the action the state actor *did* take would chill or silence a person of ordinary firmness from future First Amendment activities. Specifically, an inmate can establish a causal connection under Section 1983 by establishing that the state actor "set[] in motion a series of acts by others" which she knew or reasonably should have known would cause others to inflict the constitutional injury. *Gini v. Las Vegas Metro. Police Dep't*, 40 F.3d 1041, 1044 (9th Cir. 1994) (cleaned up).

---

Dr. Pruden, and Dr. Drake, among others, stating that she does not agree with Mr. Perez's transfer to the F-Unit for "several reasons," including that (1) he needs "more time to transition successfully without risk of self-harm once he is out of his current support system" and to complete "important work" that will be "productive in moving him forward in the right direction"; and (2) "[t]here is no clinical reason to move Mr. Perez," given that "the driver to Mr. Perez's move was Kathy Grey being upset over being named in his current lawsuit."

In his complaint, Mr. Perez alleges that Grey made concerted efforts over several months to move him to another unit. *See, e.g.*, Dkt. No. 42 at 29–32, 34, 41, 44. He has also submitted evidence supporting his allegations.

In January 2020, when Mr. Perez met with Grey after notifying her that he resigned as Tier Representative due to retaliation from staff, she told him, "[Y]ou need to reel in the massive am[oun]t of kites, emails, & requests" and "use your time by programming and learning new things rather than continually writing complaints and grievances. SOU offers so many opportunities – use your time wisely." Dkt. No. 94-1 at 95. When Mr. Perez told her that "eventually the squeaky wheel gets greased," Grey responded, "or it gets recalled." Dkt. No. 42 at 25; *see also* Dkt. No. 94 at 11. Mr. Perez avers that he understood Grey's statement about using his time wisely to imply that he would suffer an adverse action if he continued to file complaints. Dkt. No. 42 at 27.

As discussed above, several months later, in June 2020, Corrections Officer Lewis indicated in kite responses to Mr. Perez that Grey was seeking to have him transferred because of his grievance activity. Dkt. No. 5-1 at 9, 13; Dkt. No. 87 at 11; Dkt. No. 94-1 at 200, 202, 204, 210. Dr. Pruden confirmed that in September 2020, Grey was exerting "a lot of pressure" to transfer Mr. Perez due to his "grievances as well as [the] alleged infraction behavior WAC 552." Dkt. No. 94-1 at 234; Dkt. No. 87 at 17. Crouse also reported at this time that he had "heard CMHUS [Grey] express[] concern over the amount of grievances that I/Perez files and the time it takes to manage I/I Perez." Dkt. No. 94-1 at 244.

On or before February 23, 2021, Grey received Mr. Perez's complaint in this action. Dkt. No. 16. Two days later, she approached Dr. Drake about transferring Mr. Perez. Dkt. No. 87 at 25. That same day, "[a]s a result of" her meeting with Grey, Dr. Drake contacted Dr. Pruden "regarding [Mr. Perez's] potential transfer to another institution." *Id.* at 12, 14. Although Dr. Pruden acknowledged that "transfer out of residential treatment" was a "long-term goal" that Mr. Perez

1   was "working towards currently," she recommended that he "continue to receive residential level

2   of mental health care" in E-Unit because he had not yet met his short-term treatment goal of

3   "reduction in self-harm thoughts." *Id.* at 12; *see also id.* at 14 ("in an ideal world" Mr. Perez would

4   "hav[e] at least another year of work towards stability" before any transfer).

5       Despite Dr. Pruden's opposition to Mr. Perez's transfer, an administrative meeting was

6   held on March 1, 2021 to discuss it. *Id.* at 16–17. Dr. Pruden reported that "[t]he push from the

7   room" that day was to "get him out of here," and "[w]hile it was a consensus, [she] d[id]n't

8   necessarily agree with it." *Id.* at 17. Dr. Pruden further explained that staff "are fearful of him

9   filing grievances or lawsuits" and "Kathy [Grey] wants him out and had taken him to FRMT"—

10   the Facility Risk Management Team meeting. *Id.* On March 2, 2021, Dr. Pruden wrote in a Mental

11   Health Update and in a General Consult that "[o]n 2/25/2021 it became known that Mr. Perez filed

12   a lawsuit and included several officers who regularly work on E-unit," and because of this

13   "conflict," Mr. Perez was "being recommended for transfer from E-Unit to general population."

14   *Id.* at 13; Dkt. No. 94-1 at 277.[7] On March 9, 2021, the Mental Health Transfer Committee

15   approved Mr. Perez's transfer to general population. Dkt. No. 87 at 13.

16       Although the transfer was later subject to modification, delay, and debate, *see, e.g.*, Dkt.

17   No. 87 at 14; Dkt. No. 87-1 at 54–55, 62, 64, 98, 117, 120, Mr. Perez is not required to prove that

18   Grey succeeded in her efforts or that she had the unilateral power to do so. *See, e.g.*, *Gonzalez v.*

19   *Garibay*, No. 09-CV-1080-W-(MDD), 2012 WL 12875366, at *7 (S.D. Cal. Aug. 1, 2012)

20   (although corrections officer did not have the power to effect plaintiff's transfer to a less desirable

21   vocation, the officer's negative "work report and transfer *recommendation* would reasonably chill

22

23   ---

   [7] When Joanna Carns, the Director of the Office of Corrections Ombuds saw this statement, she requested a "just

24   cause investigation," stating that "[t]his is de facto retaliation and rarely is it so clearly laid out." Dkt. No. 87 at 10;
   Dkt. No. 94-1 at 486.

1    a person of ordinary firmness from future First Amendment activities." (emphasis added)). Nor

2    does he have to establish that Grey made "an explicit, specific threat of discipline or transfer[.]"

3    *Brodheim*, 584 F.3d at 1270. Again, it is sufficient to show that the actions Grey *did* take would

4    chill an ordinary inmate's protected activity. *See id.* at 1266, 1270–73 (memorandum drafted by

5    warden documenting inmate's pattern of past complaints, expressing concern that other inmates

6    were starting to file similar complaints, and recommending transfer, demonstrated that the conduct

7    identified as retaliatory was motivated by engagement in protected activity); *Harbridge v.*

8    *Schwarzenegger*, No. CV-07-4486-GW-(AS), 2022 WL 3328910, at *7 (C.D. Cal. June 24, 2022)

9    (although correctional captain never explicitly threatened plaintiff with transfer due to grievances

10   and instead said that she would transfer him because he "seemed unhappy," her comment when

11   considered in context could reasonably have been construed as a retaliatory threat), *report and*

12   *recommendation adopted sub nom. Harbridge v. Schwartzennegger*, 2022 WL 3285402 (C.D. Cal.

13   Aug. 10, 2022).

14        Here, Mr. Perez has submitted sufficient evidence to establish a genuine issue of material

15   fact as to (1) whether Grey knew or should have known that her efforts would cause others to

16   transfer Mr. Perez, and (2) whether an ordinary prisoner's First Amendment activity would be

17   chilled if the mental health unit supervisor of his unit sought his transfer out of the unit in response

18   to his activity.

19        4.    Mr. Perez has established a triable issue regarding whether Grey's transfer efforts
                were motivated by legitimate penological objectives

20

21        Defendants further contend that the decision to transfer Mr. Perez was motivated by

22   legitimate correctional goals, including: (1) to gradually send inmates to less restrictive settings,

23   (2) to allow Mr. Perez to engage with others in a new environment and create healthy interactions,

24   and (3) because "the conflict with staff . . . was not good for Perez or the proper operation of the

1  prison." Dkt. No. 98 at 3–4. With respect to the latter argument, and as the Court has already

2  explained, the only "conflict" Defendants identify is Mr. Perez's non-frivolous complaints. *See id.*

3  at 4 (explaining that staff were afraid to interact with Mr. Perez out of fear of grievances).[8]

4  Moreover, Mr. Perez has submitted evidence—also discussed above—that Grey's professed goals

5  were pretextual. There is a genuine issue of material fact as to whether Grey's efforts to transfer

6  Mr. Perez were retaliatory or instead motivated by legitimate penological objectives.

7        Mr. Perez has accordingly presented evidence which, if construed in the light most

8  favorable to him, demonstrates genuine issues for trial concerning whether Grey (1) filed a

9  fabricated infraction and sought to have Mr. Perez transferred (2) because he (3) engaged in the

10 protected activity of filing grievances and complaints against her and other MCC staff. The

11 evidence likewise creates a triable issue of fact as to whether (4) Grey's allegedly retaliatory

12 actions would deter an ordinary prisoner from filing additional grievances and (5) there was a

13 legitimate penological reason for her actions. Grey flatly denies that she took any adverse action

14 against Mr. Perez because he filed grievances. Given these opposing positions and the evidence

15 set forth by both sides, there are material factual disputes precluding summary judgment.

16 **F.      Defendants Are Entitled to Summary Judgment on Mr. Perez's Other Claims**

17        1.      Involuntary medication: Grey

18        The R&R concluded that Mr. Perez failed to meet his burden to show that Defendants

19 violated his constitutional rights by forcing him to take antipsychotic medication. Dkt. No. 101 at

---

[8] Grey also asserts that Mr. Perez did not participate in the programming in E-Unit. Dkt. No. 101 at 10–11 (quoting Dkt. No. 28 at 2–3). However, Mr. Perez has submitted evidence countering that assertion. *See* Dkt. No. 94 at 29–30, 32; Dkt. No. 94-1 at 273 (December 14, 2020 Mental Health Update summarizing Mr. Perez's activities and stating that Mr. Perez received "six positive behavior observations, three negative behavior observations and one neutral observation" during the past year); *id.* at 441–54, 459–80, 553; *see also id.* at 235 (Mills confirming that Mr. Perez has no BOEs since April 2020, does not have any major or minor infractions pending as of June 29, 2020, and does not appear to be a "management concern"); *id.* at 277 (Mental Health Update from March 4, 2021 noting that Mr. Perez received two positive behavioral observations since December 14, 2021 "for his assistance with being a positive influence for his community").

ORDER ADOPTING IN PART AND DECLINING TO ADOPT IN PART REPORT AND RECOMMENDATION - 25

7. Mr. Perez makes a variety of objections to the R&R's consideration of the evidence for his claims against Grey, Dkt. No. 102 at 7–9, but none of his objections overcome his failure to state a claim in the first instance.

Although Mr. Perez now claims that Grey "set in motion" a series of acts that caused the adverse action, Dkt. No. 102 at 7, this theory is nowhere in his complaint. As previously explained, he may not amend his complaint via an objection. The complaint's sole allegation is that Grey asked ARNP Sanneh to call her after receiving an email from Sanneh stating that he did not believe there were grounds to administer involuntary anti-psychotic medication to Mr. Perez at the time of the email. Dkt. No. 42 at 10; *see* Dkt. No. 94 at 3, 42. But the complaint never actually alleges that Grey took any particular action other than that with respect to the involuntary medication. *See Hines*, 914 F.3d at 1228 (to state a claim under Section 1983, the plaintiff must allege that each defendant "personally played a role in violating the Constitution"). Instead, Mr. Perez attempts to establish a temporal causal connection between his protected activity and his involuntary medication, alleging that (1) Grey was served with his complaint in *Perez v. Cogburn* on January 22, 2019, (2) later the same day she asked Sanneh to call her, and (3) three days later, "the process to place [Mr. Perez] officially on involuntary anti-psychotic medications was initiated." Dkt. No. 42 at 10. Although "timing can properly be considered as circumstantial evidence of retaliatory intent," timing alone will not support liability where "there is little else to support the inference," *Pratt*, 65 F.3d at 808, as is the case here.

And even if Mr. Perez had successfully stated a claim against Grey with respect to his involuntary medication (he has not), Defendants have demonstrated a specific and legitimate penological goal that Mr. Perez fails to rebut. In Sanneh's email to Grey, Sanneh expressly stated that he would "let officers know to watch out for inappropriate behaviors" and that if Mr. Perez "messed up," involuntary medication would be an option. Dkt. No. 94 at 42. Sanneh then referred

1   Mr. Perez for involuntary antipsychotic medications in January 2019 due to his history of violent

2   behavior when unmedicated. *Cogburn*, No. 2:18-CV-1800-JLR-BAT, Dkt. No. 189 at 1–2;[9] *see*

3   *also* Dkt. No. 94-1 at 278–79, 281 (documenting Mr. Perez's history of suicide attempts and self-

4   harm). This supports Defendants' contention, and the R&R's conclusion, that there was a

5   legitimate correctional goal behind the Medication Treatment Hearing Committee's ultimate

6   decision to involuntarily medicate Mr. Perez. Dkt. No. 101 at 7; *see also United States v. Loughner*,

7   672 F.3d 731, 746 (9th Cir. 2012) ("[I]nvoluntary medication is a rational means of furthering the

8   State's legitimate objectives: the interest in 'ensuring the safety of prison staffs and administrative

9   personnel,' and the 'duty to take reasonable measures for the prisoners' own safety.'" (quoting

10  *Washington v. Harper*, 494 U.S. 210, 225 (1990)).[10]

11       Accordingly, the Court adopts the R&R's conclusion that Mr. Perez has failed to create a

12  genuine issue for trial with respect to his involuntary medication claim.

13       2.   <u>Bleach spill during pruno search: Harrod and Wright</u>

14       Mr. Perez also objects to the R&R's recommendation that the Court grant summary

15  judgment on his claim regarding Harrod and Wright accidentally spilling a mixture of bleach and

16  water that he had stored in his cell during a pruno search. Dkt. No. 102 at 20–22; *see* Dkt. No. 101

17  at 13–14. Specifically, he argues that the R&R does not properly account for the overall context

18

19  [9] Mr. Perez requests that the Court take judicial notice of Sanneh's declaration in the *Cogburn* action. Dkt. No. 102 at 9.

20  [10] There are other fatal problems with Mr. Perez's involuntary medication claim. Mr. Perez relies on evidence that

21  Grey (and other "DOC staff") told him that his "housing assignment was contingent upon [his] medication compliance," and that if he did not comply he would "be placed in the Close Observation Area or segregation." Dkt. No. 94 at 2; *see also* Dkt. No. 102 at 7. But these statements, taken on their own, fail to demonstrate any connection

22  with conduct protected by the First Amendment, since there is no authority establishing that refusing to take medication constitutes protected conduct. Further, Mr. Perez does not adduce any additional facts connecting this statement to actual or threatened retaliation, and the statement occurred in August 2018, before Mr. Perez filed the

23  December 2018 lawsuit that prompted the alleged retaliation. Dkt. No. 94 at 2. Mr. Perez claims that Grey repeated a similar statement soon after his lawsuit was filed, in January 2019, *id.*, but the fact that the same statements were made

24  to him before the lawsuit as well as after filing tends to show a *lack* of connection with his lawsuit rather than the presence of one.

ORDER ADOPTING IN PART AND DECLINING TO ADOPT IN PART REPORT AND RECOMMENDATION - 27

in which the spill took place, or the fact that Harrod gave Mr. Perez a thumbs-up gesture in response to Mr. Perez's asking if he was clear to re-enter his cell following the search. Dkt. No. 102 at 21–22. Notwithstanding the R&R's express consideration of this incident, upon thorough review of the underlying record, the Court independently finds that Defendants are entitled to summary judgment on this aspect of Mr. Perez's claim.

The protected activity preceding this purportedly retaliatory action is Mr. Perez's "informal resolution request against Defendant Harrod and others" regarding cell searches, which he avers "was removed from the Sergeant[']s office and passed around at the officer's station" by McLane. Dkt. No. 102 at 22; *see also* Dkt. No. 42 at 16–17; Dkt. No. 94 at 6–7; Dkt. No. 94-1 at 6, 8, 10. The adverse action was the spilling of liquid on his property. But even if the spill could be considered an adverse action, Mr. Perez does not allege or adduce any evidence that Wright and Harrod knew of the kite naming them prior to the incident. Rather, Mr. Perez attests that McLane discussed the kites only with officers Bell and Dire. *See* Dkt. No. 94 at 6; Dkt. No. 94-1 at 10. Without more, Mr. Perez has failed to identify an issue for trial regarding whether the spill was intentional or retaliatory. *See Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 867 (9th Cir. 2016) (explaining that plaintiffs alleging First Amendment retaliation must show that "the protected activity was a substantial motivating factor in the defendant's conduct—i.e., that there was a nexus between the defendant's actions and an intent to chill speech."); *Baker v. Grant*, No. C17-1678-RSL-MAT, 2020 WL 4289271, at *5–6 (W.D. Wash. July 1, 2020) (finding "no issue of material fact or significant, probative evidence supporting a nexus between a protected activity and the alleged retaliatory actions" where plaintiff "present[ed] no evidence supporting a contention his engagement in protected activity was a factor, let alone a substantial or motivating factor, in the alleged retaliatory action."), *report and recommendation adopted*, 2020 WL 4288384 (W.D. Wash. July 27, 2020).

1      Therefore, the Court adopts the R&R's recommendation to grant summary judgment on

2   this claim.

3          3.      The mirror safety check: Dire, Johnson, and McLane

4      Mr. Perez further objects to the R&R's conclusion that Dire, Johnson, and McLane had a

5   legitimate penological reason for taking photographs of his plastic mirror, and maintains that this

6   alleged intrusion must be viewed within the overall dynamic of his life in E-Unit at that time. Dkt.

7   No. 102 at 20–23; *see* Dkt. No. 101 at 14–15. Again, Mr. Perez notes the timing of this incident—

8   just days after he issued two kites concerning cell searches and observed McLane retrieving these

9   kites from Sergeant Hale's desk and discussing them with Dire and Bell. *See* Dkt. No. 42 at 16–

10  17, 19; Dkt. No. 94 at 6–9. Consequently, Mr. Perez claims that the entry and photographing of

11  his cell "was a means to harass [him] based on his complaints about staff entering [his] cell" when

12  he was not there, and that "[t]here was no legitimate penological interest in entering [his] cell to

13  take photographs to document an alleged safety and security risk." Dkt. No. 42 at 20; Dkt. No. 94

14  at 8–9; Dkt. No. 102 at 22–23. In support of his claim, Mr. Perez notes that Defendants did not

15  provide the required paperwork upon completing this search, and that the mirror was ultimately

16  found not to present a safety risk. Dkt. No. 42 at 20; Dkt. No. 94 at 9; Dkt. No. 94-1 at 44–46; Dkt.

17  No. 102 at 23. The R&R concluded that record evidence supports a finding that Defendants

18  photographed Mr. Perez's mirror for a legitimate penological reason, in part because "[t]he mirror

19  was discovered by staff on swing shift during a routine tier check and not part of the daily cell

20  inspections." Dkt. No. 94-1 at 68; *see* Dkt. No. 101 at 14–15. The Court agrees.

21     While "[t]here is no question that routine cell searches conducted for the purpose of

22  preserving institutional order, discipline, and security further those legitimate penological goals,"

23  *Quiroz v. Horel*, 85 F. Supp. 3d 1115, 1146 (N.D. Cal. 2015), as the R&R recognized, "a cell

24  search may nonetheless constitute an adverse action . . . if performed with a retaliatory motive and

1   lacking a legitimate correctional goal," *Cejas v. Paramo*, No. 14-CV-1923-WQH(WVG), 2017

2   WL 1166288, at *6 (S.D. Cal. Mar. 28, 2017), *report and recommendation adopted*, 2017 WL

3   3822013 (S.D. Cal. Sept. 1, 2017). In this case, however, Mr. Perez has not overcome Defendants'

4   showing of a legitimate and specific concern that the mirror placement in Mr. Perez's cell would

5   allow him to improperly look outside his cell. *See* Dkt. No. 94-1 at 62 (Sergeant Hale's email

6   stating: "[The officers'] concern was that [Mr. Perez] would use the mirror to see outside his cell.

7   We discussed it and I told him, and them, that he can't see anything from the mirror that he couldn't

8   see from standing at his door, so he can put his mirror on any wall in his cell, and that was the end

9   of it."). That Defendants' security concern was ultimately unfounded does not by itself raise a

10  dispute of fact as to whether there was a legitimate penological goal behind such inquiry.

11  Moreover, the Court finds that Mr. Perez has not raised a genuine dispute as to whether taking

12  photographs of a mirror in one's cell "would chill or silence a person of ordinary firmness from

13  future First Amendment activities." *Rhodes*, 408 F.3d at 568–69 (cleaned up). Finally, the Court

14  is mindful that "excessive judicial involvement in day-to-day prison management" such as this is

15  often of little benefit to anyone, and prison officials must be afforded a measure of deference and

16  flexibility when evaluating the legitimacy of proffered penological reasons for actions. *Pratt*, 65

17  F.3d at 807.

18          Thus, the Court adopts the R&R's recommendation and grants summary judgment on this

19  claim.

20          4.      Mail handling and dinner delay: Seeley

21          Mr. Perez does not specifically object to the R&R's finding that Seeley is entitled to

22  summary judgment on Mr. Perez's retaliation claim arising from Seeley's swearing at him during

23  mail call and later delaying Mr. Perez's attendance at mainline dinner by 15 minutes. *See generally*

24  Dkt. No. 102; *see also* Dkt. No. 42 at 38–39; Dkt. No. 94 at 20; Dkt. No. 94-1 at 352; Dkt. No.

101 at 15. Nevertheless, the Court finds that summary judgment is warranted on this aspect of Mr. Perez's First Amendment retaliation claim because, as discussed in connection with his bleach spill claim, he has not provided a basis for a reasonable juror to conclude that his protected activity was a substantial motivating factor in Seeley's conduct. *See Ariz. Students' Ass'n*, 824 F.3d at 867; *Baker*, 2020 WL 4289271, at *6. Nor has he shown that Seeley's actions would chill a person of ordinary firmness from future First Amendment activity. *Brodheim*, 584 F.3d at 1271; *see also, e.g.*, *Bryant v. Asuncion*, No. CV-19-6889-SB(AGR), 2022 WL 2655815, at *10 (C.D. Cal. May 5, 2022) (defendant's verbal harassment, viewed in context, was not such as would chill a person of ordinary firmness), *report and recommendation adopted*, 2022 WL 2651959 (C.D. Cal. July 7, 2022).

5.    Mail handling: Johnson, McLane, Seeley

Mr. Perez similarly does not raise any specific objections to the R&R's treatment of his claim with respect to Johnson, McLane, and Seeley's handling of his mail. *See generally* Dkt. No. 102; *see also* Dkt. No. 101 at 15–16; Dkt. No. 42 at 39–40; Dkt. No. 94 at 21–22; Dkt. No. 94-1 at 354–58. Here too, the Court agrees with the R&R's finding that Mr. Perez's allegations fail to establish a genuine dispute of fact regarding whether these Defendants' actions amounted to unconstitutional retaliation. Although "a prison inmate[] enjoys a First Amendment right to send and receive mail," *Witherow v. Paff*, 52 F.3d 264, 265 (9th Cir. 1995) (per curiam), Mr. Perez's allegations and evidence fail to demonstrate that any alleged mail mishandling was more than an isolated incident due to confusion over the protocol. *See* Dkt. No. 42 at 39–40; Dkt. No. 94 at 21–22; Dkt. No. 87 at 22 (Crouse reporting that "[t]he officers did show a history of [Mr. Perez] filling out the log before," even though policy required officers to fill out the log); Dkt. No. 94-1 at 354, 355–58 (Level I response and investigation stating that "staff reported that they were confused with the Outgoing Legal Mail process" and "[t]here is no evidence to support that staff refused to

process [Mr. Perez's] legal mail, only that they did not comply with set procedures and this has been addressed" through instructing them on how the legal mail log is to be completed); *see also Floyd v. Ada Cnty.*, No. 21-35657, 2023 WL 370877, at *1 (9th Cir. Jan. 24, 2023) (district court properly dismissed plaintiff's claim arising from the mishandling of his legal mail because he failed to allege facts sufficient to show that defendants' mishandling of any protected legal mail was arbitrary or capricious); *Quiroz*, 85 F. Supp. 3d at 1135–38.

Accordingly, the Court adopts the R&R's recommendation on this claim.

6.     BLM mask: Crouse and Grey

Here too, Mr. Perez raises no specific objections to the R&R's recommendation that summary judgment be granted on his claim against Grey and Crouse for confiscating his BLM mask and issuing him a BOE in September 2020. *See generally* Dkt. No. 102; *see also* Dkt. No. 42 at 37–38; Dkt. No. 93 at 25; Dkt. No. 94 at 18–20; Dkt. No. 94-1 at 341, 347–48, 350, 515–51. Judge Christel found Mr. Perez's "argument that Defendants Grey and Crouse acted with a retaliatory motive to be speculative, at best," as Mr. Perez presents no evidence contradicting Defendants' assertion that they had simply misinterpreted the relevant policy. Dkt. No. 101 at 12–13.

The record indicates, and Defendants do not dispute, that DOC policy as of July 10, 2020 permitted "incarcerated individuals . . . to decorate their face coverings within appropriate guidelines," but also advised prison staff to "immediately confiscate[]" face coverings depicting "violence, derogatory statements, security threat group markings or symbols, or other offensive images[.]" Dkt. No. 94-1 at 530. It is further undisputed that on September 25, 2020, Crouse confiscated Mr. Perez's mask with the letters "BLM" on it. *Id.* at 341, 343, 345, 516; *see also id.* at 517 (search report indicating that on July 29, 2020, Mr. Perez previously had an "I can't breath[e]" face mask confiscated). The same day, Mr. Perez was written a BOE for having the

1    mask, which remained part of his institutional record until approximately July 2021. Dkt. No. 94
2    at 19–20.

3          Upon examining the record in this case, the Court adopts the R&R's conclusion that Mr.
4    Perez has failed to raise a triable issue as to Crouse and Grey's retaliatory motive because Mr.
5    Perez has not offered direct or circumstantial evidence of such motive in relation to this incident.
6    *See McCollum*, 647 F.3d at 882. Despite Mr. Perez's assertions otherwise, the record reflects
7    considerable confusion among DOC staff, including Grey, about how to implement the DOC's
8    mask policy. *See, e.g.*, Dkt. No. 94-1 at 530 (July 2020 DOC guidance memorandum on face
9    coverings stating that if staff "encounter someone wearing a face covering that depicts violence,
10   derogatory statements, security threat group markings or symbols, or other offensive images, the
11   face covering should be immediately confiscated, a BOE should be entered, and a new face
12   covering should be issued," and further encouraging staff to "use professional discretion and verbal
13   skills to address these situations in an appropriate fashion"); *id.* at 341 (Grey on September 25,
14   2020: "The BLM is a movement that is considered controversial by some people. Supt. Oberland
15   issued a directive that no one should wear masks w/ a political message – that directive includes
16   [Mr. Perez.]"); *id.* at 347 (Grey on Nov. 5, 2020: "[T]here is further discussion occurring as to
17   whether [BLM masks] are allowed."); *id.* at 531 (Warner on Feb. 9, 2021: "The memo dated July
18   10th 2020 does not specify that you can or can't write the letters "BLM". What the memo does say
19   is that you can decorate your mask coverings within appropriate guidelines. . . . Staff were
20   encouraged to use professional discretion if concerns came from the specific face covering
21   decorations."). Without showing indicia of a retaliatory animus on the part of Crouse and Grey in
22   confiscating Mr. Perez's mask, he has not presented a genuine dispute of fact.

23         Thus, the Court adopts the R&R's recommendation on this claim.

24

1

7.      General harassment: Dire, Harrod, Johnson, McLane, Seeley, Wright

2

Mr. Perez likewise raises no specific objections to the final portion of the R&R

3 recommending that summary judgment be granted on his claims of harassment as to Dire, Harrod,

4 Johnson, McLane, Seeley, and Wright. *See generally* Dkt. No. 102; *see also* Dkt. No. 101 at 17;

5 Dkt. No. 42 at 10–12, 23–24; Dkt. No. 94 at 4, 46; Dkt. No. 94-1 at 1, 45–46.

6

In his complaint, Mr. Perez makes generalized allegations about a "campaign of

7 harassment," Dkt. No. 42 at 10, and "patterns of harassment" against him, *id.* at 11, without

8 identifying who specifically harassed him. He also describes the overarching "acts of harassment"

9 he endured, such as an "increase in cell inspections/searches," staff not logging his work hours

10 resulting in decreases in pay, having his mail tampered with, and becoming the "subject of

11 harassment by other incarcerated individuals," as well as experiencing harassment by custody staff

12 "during several Tier Rep meetings both at the Superintendent/Designee level and at . . . Grey's

13 facilitated meetings." *Id.* 12, 23. Again, these assertions fail to identify specific actors. To the

14 extent these claims are not subsumed by the claims the Court has already addressed in this Order,

15 they do not include the level of specificity necessary under Section 1983 to survive summary

16 judgment. *See Hines*, 914 F.3d at 1228; *Hydrick v. Hunter*, 669 F.3d 937, 942 (9th Cir. 2012)

17 ("The absence of specifics is significant because, to establish individual liability under 42 U.S.C.

18 § 1983, 'a plaintiff must plead that each Government-official defendant, through the official's own

19 individual actions, has violated the Constitution.'" (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676

20 (2009))).

21

Mr. Perez's claim of harassment specifically levied against Dire, Harrod, Johnson,

22 McLane, Seeley, and Wright fails for the same reason. Mr. Perez alleges that he resigned as Tier

23 Representative on January 7, 2020 due to these Defendants' "continued" harassment of him

24 through:

1
2
3

> leaving the dayroom television on during recall times, leaving the television on during the entire graveyard shift interfering with sleep, not logging [Mr. Perez]'s works hours, entering Mr. [Perez]'s cell when he was not present and not leaving DOC FORM 05-384 as required, as well as tampering with [his] incoming and outgoing mail[.]

4
5
6
7
8

Dkt. No. 42 at 23–24; *see also* Dkt. No. 91 at 3. Yet, Mr. Perez does not fill in the necessary details to withstand summary judgment on this claim. The allegations in Mr. Perez's complaint, and the evidence adduced in the record, do not allow the Court to parse which individual defendant engaged in which allegedly retaliatory act. *See Hines*, 914 F.3d at 1228; *Hydrick*, 669 F.3d at 942. Summary judgment is accordingly warranted as to this claim as well.

9

        8.   <u>PREA: DOC staff</u>

10
11
12
13
14
15
16
17
18

      Finally, Mr. Perez asserts in his objections that the R&R misconstrued his allegations regarding the PREA investigation as an independent claim that the investigation was retaliatory. Dkt. No. 102 at 9. He states that these allegations instead "simply add context so to [sic] understand [his] overall claims of being subjected to a 'campaign of harassment.'" *Id.* at 10 (quoting Dkt. No. 42 at 10). Specifically, Mr. Perez claims that his substantiated PREA complaint against fellow inmate Mr. Grant, coupled with his later complaint "seeking to ensure DOC followed their own established policies and procedures" on substantiated PREA complaints, made Mr. Perez "a target of staff's hostility." *Id.* at 9. Defendants respond by asserting that Mr. Perez's contentions are "contrary to the allegations" in his complaint. Dkt. No. 104 at 2.

19
20
21
22
23
24

      To the extent Mr. Perez intended his PREA-related allegations to constitute a claim of retaliation, Defendants are entitled to summary judgment. Mr. Perez alleges that as a result of his PREA complaints, he "had his cell entered by staff when he was not around and had his mail tampered with," Dkt. No. 42 at 15, but does not identify which staff took these allegedly retaliatory actions or whether they knew about his PREA complaints before taking these actions. Again, this is insufficient to state a claim (if that is what Mr. Perez intended to do), and the Court adopts the

1   R&R's recommendation to grant summary judgment on Mr. Perez's PREA-related allegations.

2   **G.    Grey Is Not Entitled to Summary Judgment on Qualified Immunity**

3           Defendants argue that in the event the Court disagrees with the R&R, they are nevertheless

4   entitled to qualified immunity on Mr. Perez's claims. Dkt. No. 104 at 3–4; *see also* Dkt. No. 76 at

5   12–13; Dkt. No. 98 at 9–10. The R&R did not address qualified immunity, presumably because it

6   found that Mr. Perez failed to raise a triable issue of fact on his retaliation claims. Likewise, this

7   Court need not address qualified immunity with respect to claims for which Mr. Perez has failed

8   to establish a triable issue of fact. It therefore addresses qualified immunity only for Mr. Perez's

9   claims against Grey based on the allegedly fabricated infraction and her transfer efforts.

10          "Qualified immunity shields federal and state officials from money damages unless a

11  plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and

12  (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-*

13  *Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). This

14  protection "balances two important interests—the need to hold public officials accountable when

15  they exercise power irresponsibly and the need to shield officials from harassment, distraction, and

16  liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231

17  (2009).

18          In the summary judgment context, courts ask two questions. First, viewing the evidence in

19  the light most favorable to the party asserting the injury, do the facts show that the defendant's

20  conduct violated a constitutional right? *Rice v. Morehouse*, 989 F.3d 1112, 1120 (9th Cir. 2021).

21  Second, if so, was the right clearly established in light of the specific context of the case? *Id.*;

22  *accord Tuuamalemalo v. Greene*, 946 F.3d 471, 476–77 (9th Cir. 2019) (per curiam). For the latter

23  inquiry, a clearly established right "must have a sufficiently clear foundation in then-existing

24  precedent" such that "every reasonable official would know" the particular rule at issue. *District*

1    *of Columbia v. Wesby*, 138 S. Ct. 577, 589–90 (2018) (cleaned up); *accord City of Escondido v.*

2    *Emmons*, 139 S. Ct. 500, 503 (2019) (per curiam) ("Under our cases, the clearly established right

3    must be defined with specificity."). In addition, if a defendant is entitled to qualified immunity,

4    they are immune from a suit for money damages, but not from a suit seeking declaratory or

5    injunctive relief. *Brown v. Or. Dep't of Corr.*, 751 F.3d 983, 990 (9th Cir. 2014) (citing *Hydrick*,

6    669 F.3d at 939–40).

7           A prisoner's right against retaliatory punishment was clearly established well before Grey

8    took the allegedly adverse actions starting in 2019. *See Shepard*, 840 F.3d at 693; *see also, e.g.*,

9    *Rhodes*, 408 F.3d at 569–70. But "[b]ecause the analysis of a retaliation claim is largely subjective,

10   it's difficult to determine at the summary judgment stage whether a reasonable officer in [the

11   defendant]'s position would have known [s]he was violating the law." *Shepard*, 840 F.3d at 693.

12   As this Court has explained, a jury could determine that Grey was motivated by retaliatory animus

13   and did not act reasonably in filing the infraction and recommending Mr. Perez's transfer. *See id.*

14   at 692 ("[A] prison official who uses a valid procedure as subterfuge to obscure retaliation 'cannot

15   assert that [his action] served a valid penological purpose, even though [the prisoner] may have

16   arguably ended up where he belonged.'" (alterations in original) (quoting *Bruce*, 351 F.3d at

17   1289)); *Hines v. Gomez*, 108 F.3d 265, 269 (9th Cir. 1997) ("[W]here a prisoner alleges a

18   correctional officer has falsely accused him of violating a prison rule in retaliation for the

19   prisoner's exercise of his constitutional rights," that officer may be subject to liability). But a jury

20   could also conclude that Grey reasonably believed her infraction report was truthful, and that she

21   was acting in furtherance of a legitimate penological objective—e.g., to eventually transfer inmates

22   out of residential treatment—when she sought the transfer. In the latter circumstance, Grey would

23   not have violated any right, let alone a clearly established one. But in the former, Grey would have

24   been "knowingly violat[ing] the law." *al–Kidd*, 563 U.S. at 743 (quoting *Malley v. Briggs*, 475

1    U.S. 335, 341 (1986)). "Resolution of the disputed factual issues is thus 'critical to a proper

2    determination of [Grey's] entitlement to qualified immunity,'" *Shepard*, 840 F.3d at 694 (quoting

3    *Glenn v. Wash. Cnty.*, 673 F.3d 864, 870 (9th Cir. 2011)), and Grey is therefore not entitled to

4    summary judgment on this issue.

5                                    **III.    CONCLUSION**

6            For the reasons stated above, the Court ADOPTS IN PART and DECLINES TO ADOPT

7    IN PART Judge Christel's Report and Recommendation, Dkt. No. 101. The Court GRANTS IN

8    PART and DENIES IN PART Defendants' motion for summary judgment, Dkt. No. 76, GRANTS

9    Mr. Perez's motion seeking leave to amend exhibits, Dkt. No. 103, and DENIES as moot Mr.

10   Perez's motions seeking a ruling on the pending motions, Dkt. Nos. 105, 108.

11           The Court is cognizant that "[e]ven *pro se* plaintiffs with sufficient skills to survive

12   summary judgment are unlikely to be able to try a case," *Ficken v. Alvarez*, 146 F.3d 978, 981

13   (D.C. Cir. 1998), so in the event a "case [involving a pro se plaintiff] proceeds to trial, [the court]

14   should give serious consideration to appointing counsel," Federal Judicial Center, *Civil Litigation*

15   *Management Manual,* 135 (3d ed. 2022). Accordingly, should Mr. Perez still desire appointment

16   of counsel, he may file a renewed motion seeking such appointment by no later than May 1, 2023.

17           The Court further ORDERS the parties to meet and confer and file a joint status report

18   proposing a trial date and pretrial deadlines by no later than June 1, 2023. The parties' proposed

19   deadlines should provide at least as much time between deadlines and the proposed trial date as

20   provided in this Court's scheduling template. *See* Standing Order for All Civil Cases, Section I,

21   //

22   //

23   //

24   //

ORDER ADOPTING IN PART AND DECLINING TO ADOPT IN PART REPORT AND RECOMMENDATION
- 38

1  https://www.wawd.uscourts.gov/sites/wawd/files/2023_01_09%20King%20Standing%20Order

2  %20re%20Civil%20Cases_.pdf.

3          Dated this 30th day of March, 2023.

4

5                                                    Lauren King
                                                     United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24